**UNITED STATES of America,**
**Appellee,**

v.

**John "Sonny" FRANZESE and Nicho-**
**las Potere, Defendants-Appellants.**

**Nos. 183, 240, Dockets 75–2051, 75–2081.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1975.

Decided Oct. 30, 1975.

Herbert A. Lyon, Kew Gardens, N. Y.
(Lyon & Erlbaum, William M. Erlbaum,
and Charles Wender, Kew Gardens, N.
Y., of counsel), for appellant John
Franzese.

Henry J. Boitel, New York City, for
appellant Nicholas Potere.

Paul F. Corcoran, Asst. U. S. Atty.
(David G. Trager, U. S. Atty., E. D. N.
Y., and Paul B. Bergman, Asst. U. S.
Atty., of counsel), for appellee.

Before FRIENDLY, HAYS and FEIN-
BERG, Circuit Judges.

HENRY J. FRIENDLY, Circuit Judge:

By separate notices of motion John
("Sonny") Franzese and Nicholas Potere
applied in 1974 to the District Court for
the Eastern District of New York for an
order, pursuant to 28 U.S.C. § 2255, to
vacate their convictions on three sub-
stantive counts and a conspiracy count
relating to bank robberies, which we had
affirmed on appeal seven years ago, 392
F.2d 954 (2 Cir. 1968).[1] Chief Judge

1. Our judgment as to Franzese was vacated, along with those in a number of other cases, in *Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), and remanded to the district court for further proceedings relating to the lawfulness of certain electronic surveillance. Following a hearing, a new judgment of conviction was entered on March 26, 1970.

Mishler denied the applications in an opinion without holding an evidentiary hearing; Franzese and Potere appeal. Familiarity with our earlier opinion will be assumed.

The chief support for the motion was an affidavit dated October 19, 1974 of Eleanor Cordero, wife of John Cordero, one of the four confessed participants in the robberies.[2] The testimony of these four was the principal, indeed almost the sole, basis of the Government's case, see 392 F.2d at 957 & n. 3. The thrust of Mrs. Cordero's affidavit was that the 1965 robberies had been committed by some or all of the confessed participants, substantially as testified at the trial, but with Eleanor playing an important role and Anne Messineo, see 392 F.2d at 958, playing none, and with no planning or participation in the fruits by Franzese, Potere, or the other defendants convicted in the 1967 trial. Omitting many portions of the affidavit which we deem immaterial, we can summarize it as follows:

Eleanor had first met Cordero in late June of 1965. They "became intimate and were later married," as indicated below. In early July, 1965, she became aware that he was robbing banks and also that Smith, Parks and Zaher were committing bank robberies. On or about July 14, 1965, she and John Cordero drove Parks and Smith to "the airport" whence Parks and Smith took a plane to Puerto Rico. Under the name of Eleanor Grisci she received a postcard from Smith postmarked in San Juan on July 19.[3] After receipt of the card but before Smith's return, she and John Cordero went to Baltimore, stayed at the Holiday Inn under the assumed name Capone, and cased some banks.[4] On July 30 Cordero, Parks and Smith robbed the "Kew Gardens Branch of United Savings and Loan Association, 75–21 Main Street,"[5] with Eleanor acting as driver of the getaway car and receiving a one-fourth share of the proceeds which were divided among the four. On August 13 John Cordero, Smith and Parks robbed the bank in Oceanside as charged in substantive count 4. Eleanor drove a stolen car to and from the bank; the "car had been stolen from the Tavern on the Green in Central Park"; and the proceeds were split among the four actual participants, with nothing held out for the alleged supervisors. After the robbery she and John repaired to a courthouse in Queens to get married. Anne Messineo did not participate in either robbery; "her name was used after the story about Tony Polisi was concocted."[6] Mrs. Cordero was present in Chicopee, Mass., where the Holyoke National Bank was robbed; this was done by Smith, Parks and Cordero, as testified at the trial, but they alone shared the proceeds and Sal Polisi did not participate. Her story of the Denver and Salt Lake City robberies did not diverge substantially from that told at trial, 392 F.2d at 958, except for her claim that only Cordero, Smith and Parks shared the proceeds.

The affidavit went on to say that after their arrest on October 1, 1965, she

2. The others were Smith, Parks and Zaher. The case was unusual in that none of the defendants who went to trial was claimed to have been present at any of the robberies, these having been perpetrated by Cordero, Parks and Smith, or some of them.

3. A copy of this card was attached to the moving affidavit of Franzese's attorney.

4. The alleged significance of the Puerto-Rico/Baltimore story is that, if true, it casts serious doubt on the ability of Smith, Parks and possibly John Cordero to have attended the organization meeting at the Aqueduct Motor Inn "on an evening in late July, 1965," 392 F.2d at 957. The district judge, however, found the facts now alleged "not inconsistent with the testimony of Mr. Cordero as to the approximate time of that meeting." Given our disposition, we have no occasion to pass on that finding.

5. Presumably this was a reference to the July 30 robbery of the County Federal Savings and Loan Association of Queens, 392 F.2d at 958, located at the given address.

6. In addition to 392 F.2d at 957 & n. 4, see *United States v. Polisi*, 416 F.2d 573 (2 Cir. 1969).

met with her husband on a number of occasions at the West Street Detention Center and at the office of the Assistant United States Attorney, Mr. Gillen; that "during this time" John told her that he, Parks, Smith and Zaher "concocted a story to involve the Polisis as the masterminds of the robberies" and had substituted Anne Messineo for her "to give further credence to their story, since she [Anne] was associated with the Aqueduct" Motor Inn which Anthony Polisi owned. Later, when the four learned that the sole consideration they would receive for involving the Polisis was that they would get only 25 years rather than 125, they devised a scheme to implicate Franzese. Eleanor Cordero had never met Franzese; John Cordero had never mentioned his name in connection with the robberies in question; there were no floor plans and no central organization devised escape routes or procured stolen cars for the participants' benefit, see 392 F.2d at 957–58.

In its answering memorandum the United States claimed that, although labeled as a proceeding under 28 U.S.C. § 2255, the motion was in fact one for a new trial based on alleged newly discovered evidence and was barred by the two-year limitation of F.R.Cr.P. 33. It pointed out "that no showing of prosecutorial misconduct has been made here"; although "in light of the general content of Eleanor Cordero's affidavit, it might have been expected that such an allegation would be made by her . . . her affidavit is devoid of any facts tending to support such a finding."

Predictably the movants accepted the invitation and attempted to remedy the deficiency. The attempt was embodied in a further affidavit by Eleanor Cordero dated January 15, 1975. The principal allegations were as follows:

(1) During the trial John Cordero told her that the prosecutor had told him that Franzese's counsel would put her young daughter Stephanie on the stand. She then questioned Stephanie who told her the facts stated in an affidavit also submitted. These were that at the time of her mother's arrest in October, 1965—when Stephanie was five years old—FBI agents taking her to a foster home asked if she knew that her mother was a bank robber and stated that they knew that John and Eleanor had taken Stephanie in their car and had caused her to wait two hours while they went off and returned in another car.

(2) "When I was arrested, the government already had information that I was involved in the bank robberies and that I was the driver of the get-away car. My husband, John Cordero, in his negotiations with the government, was able to make a deal where I would be cut loose from the case. It would be arranged that Ann Messineo would be substituted in my place as the driver of the get-away cars. When my husband told me of the arrangement, I asked him if Ann Messineo looked like me. He told me that it doesn't matter what she looks like, we're going to get the deal. My husband told me that I was even identified by eyewitnesses to the robberies but that I would be cut loose. No agent or United States Attorney ever made me explain my actions, or even say a word about my knowledge of the robberies. Yet I was not prosecuted."

(3) Although "[a]t first the government agents stated that they had found the bank robbery money" in the suitcase containing some $10,000 in currency seized in Cordero's house upon his arrest on October 1, 1965, see 392 F.2d at 963, the money was returned without question after a deal had been made with John Cordero despite the fact that "[t]he Government knew that some of the money found (together with the money that was returned to me) actually had the same serial numbers that were reported stolen."

(4) "Before my arraignment, Mr. Gillen accused me of being a participant in the robberies. I never denied that fact to Mr. Gillen, but only refused to speak to him until I was able to

consult an attorney. At no time, however, did I ever deny my participation in the robberies to any agent of the Federal Government. Neither Mr. Gillen nor any other United States Attorney ever asked me to do so. Even after the substitution of Messineo for myself, I was never asked to deny my involvement. Much to my surprise and relief, after my arrest, I was never viewed by any eyewitnesses."·

Evidently believing they had thus parried the Government's claim of failure to allege prosecutorial misconduct, the petitioners were emboldened to seize the initiative. Noting the trial court's request for· relevant affidavits, counsel for Franzese, in their memorandum accompanying this second set of affidavits, put forth the following challenge:

It is significant to note that the Government . . . failed to deny by affidavit Mrs. Eleanor Cordero's allegations. We submit that they will be unable to do so.

It was now the Government's turn to seek to fend off the attack, which it did by submitting various documents. The most dramatic was a report by an FBI special agent of an interview with Mrs. Cordero on October 4, 1971. This recounted that on September 29 she had been asked to go to a bar to meet a man purporting to be an investigator for a named law firm representing Franzese to talk "about getting Sonny Franzese out of jail;" that she telephoned the New York City Police, who were giving her protection because of a brutal assault by her husband; that the police advised her to go to the bar, where the meeting would be observed by an officer; that the investigator asked her if she knew that her husband had been lying in the Franzese trial, to which she answered in the negative; that the investigator told her that "we" would make it worth her while, to the tune of $50,000, to go to court and say that Cordero had lied; that another man accompanying the investigator said, "I want Sonny out no matter what;" and that Eleanor declined the offer. The in-

vestigator also asked her help in locating Smith and Parks.

In addition, former Assistant United States Attorney Gillen submitted an affidavit to which was attached a report of an FBI Special Agent, reciting a statement by Gillen that both Mr.·and Mrs. Cordero had denied her participation in the robberies. Understandably Gillen could not recall, after nine years, just when this denial had been made, but did place it as having occurred prior to February 7, 1966.

Finally, the Government submitted various FBI reports stating that an officer of the bank robbed on August 13 had reported that the felons had "escaped in a 1965 dark colored Buick driven by a woman;" that a car matching the description had been located very shortly thereafter; and that this car had been reported stolen from the parking lot of the Kew Motor Inn.

This material precipitated the introduction of yet a further affidavit of Mrs. Cordero, dated March 10, 1975. In it she conceded that the car she had claimed to have driven was stolen from the Kew Motor Inn; she attempted to rehabilitate her first affidavit by saying that another car, used as a "switch car" by Parks and Smith, had been the car stolen from the Tavern on the Green. She also explained her unwillingness to come forward in 1971 on the basis of fear of her husband; she did not deny that the overture had been made and the payment offered.

 Having lost below, appellants now criticize the district court for having relied on the materials submitted by the Government in response to their challenge since these went beyond "the files and records of the case," 28 U.S.C. § 2255. See *Walker v. Johnston*, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830 (1941); *Waley v. Johnston*, 316 U.S. 101, 62 S.Ct. 694, 86 L.Ed. 1302 (1942); *Pennsylvania ex rel. Herman v. Claudy*, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126 (1956). As explained in *United States v. Salerno*, 290 F.2d 105, 106 (2 Cir. 1961), such material may be considered as

"showing that petitioner's factual allegations were not to be deemed admitted for the purpose of determining whether a hearing should be had," although not as a basis for finding a petitioner's allegations to be false. See *Taylor v. United States*, 487 F.2d 307 (2 Cir. 1973). As we have more recently said, such affidavits "may be considered in assessing the sufficiency of the petitioner's supporting affidavit," *Dalli v. United States*, 491 F.2d 758, 762 n. 4 (2 Cir. 1974). Given these standards, we find little in Judge Mishler's opinion that would indicate that he used the Government's materials for a proscribed purpose. In any case, such difficulty as might exist is largely of appellants' own making, since they challenged the Government to deny Mrs. Cordero's statements by affidavit. Indeed, it could be argued with some force that by offering Mrs. Cordero's March 10 affidavit, which in effect admitted much of the Government's material but endeavored to explain it away, the movants made the bulk of that material a proper subject for consideration by the judge.

■ Appellants' more basic contention is that if Eleanor Cordero was telling the truth, their convictions were obtained through the "government's use of known perjured testimony and suppression of material evidence," in violation of their constitutional rights—*Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)—and that they are therefore entitled to a hearing at which her credibility can be tested. The trial court found, *inter alia*,

that in several respects the facts alleged by Mrs. Cordero were not inconsistent with the testimony given at the trial, and that, "concerning Mrs. Cordero's participation in the robberies," "[a] fair reading of the record shows that the Government revealed everything it knew." We affirm, for even crediting Mrs. Cordero's affidavits, we do not think they make out a sufficient claim of prosecutorial suppression of information relevant to the credibility of trial witnesses to warrant § 2255 relief.

Mrs. Cordero's affidavits seem to say more on the score of prosecutorial misconduct than they actually do. The bulk of them, claiming that the entire story of management of the enterprise by Franzese and the four other defendants was a concoction, must be put aside since it is not alleged with any specificity that the Government had any reason to think the testimony was other than true—or, indeed, that it now does.[7] Moreover, as we said in *Dalli v. United States, supra,* 491 F.2d at 760–61 (citations omitted):

> Mere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself. The petitioner must set forth facts which he is in a position to establish by competent evidence.

The claim of prosecutorial misconduct thus is simply that the Government knew more of the involvement of Mrs. Cordero, and the lack of involvement of Anne Messineo, than was revealed by the witnesses or in documents turned over to the defense, and that exposure of the truth would have strengthened the defendants' impeachment of the Government's witnesses.

---

7. Petitioners' counsel have made it clear on appeal that their motion is based on 28 U.S.C. § 2255, and not on F.R.Cr.P. 33. A Rule 33 motion based on newly discovered evidence would have been untimely, since it "may be made only before or within two years after final judgment." This limitation was inserted by the Supreme Court in the face of the Advisory Committee's proposal that there be no limit. See 8A Moore, Federal Practice ¶ 33.03[2] at 33–16 (1975). There is no need to decide

whether there could ever be circumstances under which § 2255 could be invoked to challenge a conviction on the basis of perjury of essential prosecution witnesses *simpliciter*. Clearly such circumstances are not presented by affidavits like those of Mrs. Cordero, who had no personal knowledge of the critical facts, especially in the light of the finding of the district judge that her "testimony would not produce a different result in the event of retrial."

The Government, however, had made no secret of the possibility that Mrs. Cordero had been a participant in the bank robberies. Defendants knew that Mrs. Cordero had been arrested for bank robberies and the Government had disclosed that this was on the basis of an affidavit by FBI Agent Murphy, which in turn was based on the statement of an informer, 392 F.2d at 962.[8] The Government had turned over an FBI report which recorded Cordero as stating that his wife had driven one of the three switch cars following the Oceanside bank robbery on August 13. Cordero was thoroughly cross-examined about this, 392 F.2d at 961–62; his statement was featured in the summation of Franzese's counsel; and the judge instructed the jury it could find that Mrs. Cordero was "really in" one of the robberies and that Cordero "was really interested in seeing her out, out of jail and out of the proceedings, and this was part of the bargaining power and this was his motive for testifying." Although Mrs. Cordero asserts her complicity now that the statute of limitations bars prosecution for participating in the bank robberies, she does not say that she had ever done so before; she asserts only that she did not deny it. The affidavits make liberal use of conclusory statements and of the passive voice; the only allegation that a named member of the prosecutorial team did anything is that, after Mrs. Cordero's arrest and before her arraignment, Mr.

Gillen accused her of being a participant in the bank robberies and she did not deny this but refused to speak until she could consult an attorney. If we credit Mrs. Cordero on this point, this is still not at all the equivalent of an admission on her part. Mrs. Cordero's statement that the money returned to her included bills with serial numbers identical to those that had been stolen was in flat contradiction of the 1965 affidavit by which she obtained the money, see 392 F.2d at 963; and the earlier affidavit is the relevant one in terms of the Government's knowledge at the time of trial.

Although the question may have been close, we are unwilling to reverse the district court's decision not to conduct a hearing.[9] Chief Judge Mishler had the advantage of intimate familiarity with the case, born of many pre- and post-trial motions[10] and a long trial where he had the opportunity to observe the witnesses. Compare *Williams v. United States*, 503 F.2d 995 (2 Cir. 1974). As Mr. Justice Stewart said in *Machibroda v. United States*, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962), "The language of the statute [§ 2255] does not strip the district courts of all discretion to exercise their common sense." Viewing the record as a whole and considering what Mrs. Cordero's affidavits did not say as well as what they did, we hold that the judge was not required to conduct an evidentiary hearing.

Affirmed.

---

**8.** Appellant Potere moved, in the court below, for the production of the informer who initially identified Mrs. Cordero as connected with the robberies, or at least for an order directing the Government to file "under seal, any and all information it has in its possession concerning and derived from the informant in question." In addition to the considerations adduced in our discussion of a parallel contention made on direct appeal—see 392 F.2d at 961–63—we think it sufficient to say that production need not be ordered in a § 2255 proceeding when the allegations of a prisoner do not establish "a prima facie case for relief." See *Harris v.*

*Nelson*, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969).

**9.** Movants have made some allegations of prosecutorial misconduct in addition to those reviewed in this opinion; we have considered these but reject them as negligible.

**10.** There had been two previous new trial motions: *United States v. Franzese*, 321 F.Supp. 993 (E.D.N.Y.1970), aff'd, 438 F.2d 536 (2 Cir.), cert. denied, 402 U.S. 995, 91 S.Ct. 2172, 29 L.Ed.2d 161 (1971); the second motion was denied in an unreported opinion.