**Samuel D. WRIGHT, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Nos. 77 CR 181 (ERN), 80 CV 888 (ERN).**

United States District Court, E.D. New York.

March 11, 1983.

---

David S. Golub, Silver, Golub & Sandak, Stamford, Conn., for petitioner.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. by Victor J. Rocco, Asst. U.S. Atty., for respondent.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Pursuant to 28 U.S.C. § 2255 and Rule 33, F.R.Crim.P., petitioner Samuel Wright seeks to vacate his 1978 convictions for conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and for extortion "under color of official right," in violation of 18 U.S.C. § 1951. In a separate motion filed *pro se,* petitioner requests discovery into or an evidentiary hearing on the merits of his § 2255 motion.[1] For the reasons discussed below, both motions are denied in their entirety.

Petitioner's convictions for extortion and conspiracy resulted from his request for, and acceptance of, a $5,000 payment from Behavioral Research Laboratories, Inc. (BRL), a supplier of educational materials, during his tenure as chairman of New York City Community School Board 23. The jury concluded that petitioner extorted the $5,000 from BRL by insinuating that BRL's chances of renewing its several hundred thousand dollar, federally-funded contract with District 23 might rest on this payment. The jury also found that an agreement to defraud the United States was reached between BRL and petitioner whereby petitioner implicitly agreed to use his power and influence on the school board to effectuate the BRL renewal proposal.

Petitioner was sentenced to three months incarceration, nine months probation and a $5,000 fine, all stayed pending appeal. On appeal, the Second Circuit affirmed the judgment of the jury, and the Supreme Court denied certiorari. *United States v. Wright,* 588 F.2d 31 (2d Cir.1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979).

In April of 1980, on the last day of his probationary term, petitioner filed the first

---

1. Petitioner's motion papers also request that the documents sealed on March 15, 1978 be released for use in this petition. These materials, which relate to the identity of a government witness at trial, were unsealed by an order dated May 15, 1982. As Mr. Rocco's letter of May 14, 1982 indicates, the government provided petitioner's attorney with copies of these documents quite some time ago.

version of this motion.[2] Pursuant to an informal discovery agreement between petitioner's counsel and the United States Attorney's office, *see* letters of Victor J. Rocco, Esq., dated June 19, 1982 and December 8, 1982, and various state and federal Freedom of Information Act requests, *see Wright v. IRS,* 81 CV 1616; *Wright v. Department of Justice,* 81 CV 1617, petitioner uncovered a plethora of materials which he has since appended to his original moving papers. In response, the government has also filed voluminous opposition papers and affidavits. In December of 1982, petitioner's *pro se* request for further discovery was filed, along with what appears to be the final version of petitioner's substantive claims. Since petitioner now appears to have satisfied himself that he has filed sufficient documentary evidence of his claims, his request for a hearing on the merits of his § 2255 motion can now be addressed.

Petitioner's motion papers delineate seven distinct claims and raise numerous others inferentially. Analytically, however, these claims fall into three distinct categories, and will be discussed accordingly.

I. *The Brady Claims*

Petitioner's motion for post-conviction relief rests almost entirely on the various documents and materials he has discovered since trial. Most of this information, he contends, was suppressed by the government in violation of its constitutional disclosure obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As both parties recognize, the preliminary issue raised by this claim is whether any of this newly-discovered evidence is exculpatory in the *Brady* sense.

In *Brady* the Court held that, irrespective of the rules governing criminal discovery, the due process clause of the Fifth and Fourteenth Amendments requires the prosecution to disclose information specifically requested by the defendant which *might* be "material" to his defense. *Id.* at 87, 83 S.Ct. at 1196–97. The *Brady* rule was subsequently expanded by the Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), to include a prosecutorial obligation to divulge obviously exculpatory evidence regardless of the request. In expanding the rule, however, the Court was quick to reject "the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel," and, hence in cases where no request or only a general request for exculpatory information has been made, "the constitutional standard of materiality must impose a higher burden on the defendant." *Id.* at 113, 96 S.Ct. at 2402.

■ To achieve that result, the Court formulated a two-tier test for analyzing the problem of non-disclosure. In cases where the information was withheld despite defendant's specific disclosure demands, the standard of materiality is more lenient: the defendant will be entitled to a new trial if there is any reasonable likelihood that the disclosure of the information could have affected the judgment of the jury. *Id.* at 103, 104–06, 96 S.Ct. at 2397–99; *United States v. Provenzano,* 615 F.2d 37, 47 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980); *Ostrer v. United States,* 577 F.2d 782, 786 (2d Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979). In cases where the defendant has made no request for the undisclosed information or only a general request

---

**2.** The government contends that "since Wright has fully served his sentence," he is no longer "in custody" as required by 28 U.S.C. § 2255, and hence can only obtain relief through a petition for the extraordinary writ of coram nobis. The present freedom of petitioner, however, is irrelevant for purposes of invoking § 2255; a § 2255 action may be maintained so long as the petitioner filed the motion while still in the "custody" of probation authorities. *Ohrynowicz v. United States,* 542 F.2d 715, 717

n. 3 (7th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 650, 50 L.Ed.2d 630 (1976); *United States v. Loschiavo,* 531 F.2d 659, 662 (2d Cir.1976); *see United States v. Hearst,* 638 F.2d 1190, 1192 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *United States v. Condit,* 621 F.2d 1096, 1098 (10th Cir.1980). Since petitioner was technically still under the supervision of probation at the time the petition was filed, the government's contention must be rejected.

the standard is strict: the defendant's conviction will be set aside "only if the undisclosed evidence, viewed in the context of the entire record, creates a reasonable doubt as to his guilt." *United States v. Agurs,* 427 U.S. at 112–13, 96 S.Ct. at 2401–02; *United States v. Provenzano,* 615 F.2d at 47; *Ostrer v. United States,* 577 F.2d at 768.

Applying these standards to petitioner's *Brady* claims, it is apparent that the nondisclosure of the evidence cited by petitioner did not deny him a fair trial.

### A. *The Tape Recording*

■ Petitioner's principal *Brady* claim concerns the undisclosed tape recording of the August 9, 1973 school board meeting at which the BRL contract proposal was debated and approved. PX D.[3] In reviewing the importance of the tape to his defense, he argues that the Court should apply the more lenient standard of materiality, because, prior to trial, he expressly requested "any alleged consensual recording of [his] conversations." PX O, # 15. The government, on the other hand, contends that this demand must be construed as a general request under *Agurs* in that it failed to specify the source of the recordings or refer to the actual date of the meeting.

The government's contention, however, ignores its obligation under Rule 16(a)(1)(A) to "permit the defendant to inspect and copy or photograph: *any* relevant written or recorded statements made by the defendant ... within the possession of the government." Contrary to the government's assertions in this case, this rule does not require the defendant to designate the source of the recordings, Fed.R.Crim.P. Rule 16 advisory committee note, nor is it limited to conversations recorded by the government. *United States v. Caldwell,* 543 F.2d 1333, 1352–53 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Crisona,* 416 F.2d 107, 113–15 (2d Cir.1969), *cert. denied,* 397 U.S. 961, 90 S.Ct. 993, 25 L.Ed.2d 253 (1970); *United States v. Sherwood,* 527 F.Supp. 1001, 1003 (W.D.N.Y. 1981). While this does not mean that every statement made by a defendant will be relevant to his defense, *e.g., United States v. Gleason,* 616 F.2d 2, 25 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980), the safest course for the prosecution is to "seek a ruling from the court on whether a particular [item] is discoverable." *United States v. Johnson,* 525 F.2d 999, 1005 (2d Cir.1975). Having failed to disclose the tape either to the Court or to defense counsel as required by Rule 16, the government cannot now claim that the request was too general to give rise to the minimum disclosure requirements discussed in *Agurs. See United States v. McElroy,* 697 F.2d 459 at 465 (2d Cir.1982) (failure to comply with Rule 16(a)(1)(A) may constitute independent grounds for reversal); *United States v. Padrone,* 406 F.2d 560, 561 (2d Cir.1969) (same).

Nevertheless, even applying the more lenient *Agurs* standard of "materiality," it is apparent that nothing on the tape mandates a new trial. To begin with, the school board vote on the BRL proposal was not an element of either of the crimes with which petitioner was charged. On the Hobbs Act count, the jury was instructed that they could convict even if they believed petitioner's claim that he had not voted on the BRL proposal. TT 2110. It was not even necessary for the government to show that petitioner affected the actual vote or even that he promised BRL that he would do so. TT 2112. As the Second Circuit noted in affirming petitioner's conviction under the Hobbs Act, "evidence of such a quid pro quo ... is not an essential element of the crime [of extortion]." *United States v. Wright,* 588 F.2d at 35 n. 2.

On the conspiracy charge, the government had to show beyond a reasonable doubt that an agreement to effect the disbursal of federal funds was made between BRL and petitioner and that one of the overt acts charged in the indictment was

---

**3.** Plaintiff's and respondent's exhibits are cited throughout this opinion as PX and RX respectively. Citations to the trial transcript appear as TT.

committed by petitioner or a co-conspirator. TT 2109–12. Clearly, the actual adoption of the BRL program in August 1973 was unnecessary to support the jury's conclusion that an illicit agreement had been reached in February of 1973. *See United States v. Wright,* 588 F.2d at 34. Indeed, neither the vote, nor the August 9, 1973 school board meeting was even charged as an overt act in the indictment.

Petitioner apparently recognizes that the vote was an issue collateral to the question of his guilt, because he premises his *Brady* challenge not on the exculpatory nature of the tape, but rather on its "usefulness" to his defense. His argument essentially rests on the tape being used to corroborate his own testimony that he did not vote on the BRL contract. TT 1582. Since the tape is blank during the entire BRL debate and vote, *see* discussion *infra,* this contention rests entirely on inferences drawn from an extremely strained interpretation of the tape and that interpretation's impact on testimony adduced at trial.

At trial, Dorothy DeVouse, a government witness, testified that petitioner and four other members of the Board voted for the BRL program while the other four Board members voted against it. TT 932. Petitioner argues that the tape rebuts this version of the vote, by indirectly corroborating Zedia Harrington's testimony that she voted for the BRL program rather than against it as stated by DeVouse. TT 1218. In support of this contention, he points to several statements on the tape, purportedly made by Harrington, which indicate her general "support of petitioner and Board policies," apparently believing that these generalities indicate how Harrington voted on the BRL proposal. The statements ascribed to Harrington, however, even if they actually refer to petitioner, are so vague as to border on irrelevancy, and clearly do not constitute a viable means of corroborating Harrington's version of her vote.[4]

Moreover, even if the tape corroborated Harrington's testimony, it is difficult to see how her testimony corroborated petitioner's position that he abstained on the BRL vote: Harrington testified that she couldn't remember how petitioner voted. TT 1218. Apparently petitioner's argument is that if Harrington's testimony concerning her vote were corroborated, then the jury would also have credited her testimony that she "thought" six Board members approved the BRL program, hence supporting petitioner's position that he did not vote because he only voted to break a tie vote of 4–4. The transcript of the recording submitted by petitioner, however, contains two 6–3 votes and one 6–2–1 vote on subsequent Board resolutions. The recording thus flatly contradicts the trial testimony of defense witnesses Richardson, TT 1302–03, Luberti, TT 1429, and Vega, TT 1468, all of whom testified that petitioner never voted unless his vote was necessary. Since the tape undermines the defense theory of the vote, it simply cannot be argued that its introduction at trial could have affected the judgment of the jury.

Petitioner nevertheless attempts to bolster his claim that the tape was *Brady* material by suggesting that the 40-minute gap itself would have been an issue at trial. Through the affidavits of two members of

---

4. The portion of the transcript cited by petitioner to support this contention contains statements which seem to indicate Mrs. Harrington's support of parent-teacher cooperation rather than support of petitioner and board policies. The transcript reads:

"Yes, I would like to say a few things too, to parents and to the PTA and to people that are here. I hope to be working very very hard in helping the parents association bring about a change in terms of parents involvement that is one of the major things I hope to do with your help. The way I'm sitting here listening hearing you talking means we all got a lot of work to do. The school board can't do it alone. The teachers can't do it alone either. It takes a corolation of all of those working together for the better of our children. I'm going to be doing my part to help you and I expect you as parents, as PTA president and all of us to put forth your efforts when you have a PTA meeting let me know, on my own time I will be happy to come sit with you, to help you get more parents involved. Until you get more parents involved in your school we are not going to ever have any chance."

the School Board's multi-media staff, petitioner claims that the entire meeting was recorded, and to the best of his affiants' knowledge the tape originally had no gaps of silence. PX E, F. This conclusion is based on their assumption that the August 9, 1973 tape was subjected to normal review procedures for audio clarity and continuity, which would have disclosed the periods of silence. *Id.* The factually unsupported assumptions of the multi-media staff members, however, are completely refuted by the affidavits submitted by the government.

The government's affiants state that the tape came into the possession of the United States Attorney's Office sometime in February or March of 1978 pursuant to subpoena for Board of Education documents. Amended Affidavit of Criminal Investigator Anthony Valenti, ¶ 2. After noticing that "[t]he recording ended prematurely," the government immediately arranged to have the tape analyzed by Professor Mark Weiss of Queens College of the City University of New York. *Id.* Professor Weiss reported to the government, prior to trial, that the claimed "gaps" were not the result of erasure, but appeared to be the product of the recorder being turned off. Affidavit of Mark R. Weiss, ¶ 2. These results were reconfirmed by Professor Weiss in two subsequent examinations, *id.,* one conducted at the behest of the United States Attorney's Office in September of 1980, Valenti Aff. ¶ 10, and one performed at the request of the Board of Education in February of 1980. Affidavit of Sinai Halberstam, Assistant Director, Office of the Auditor General, Board of Education, ¶ 3. This latter report was given to petitioner two months before he filed this petition. *Id.,* ¶ 3. The petitioner has not disputed the results of these examinations.

Although opposing affidavits from the government cannot be deemed a part of the records and files of this case for the purpose of denying relief under § 2255, *Taylor v. United States,* 487 F.2d 307, 308 (2d Cir. 1973), they may be considered in assessing the sufficiency of petitioner's supporting affidavit. *United States v. Franzese,* 525 F.2d 27, 31 (2d Cir.1975); *Dalli v. United States,* 491 F.2d 758, 762 n. 4 (2d Cir.1974); *United States v. Manfredi,* 447 F.Supp. 847, 851 (S.D.N.Y.1978). In this instance, the uncontroverted findings of Professor Weiss demonstrate that petitioner's claim of prosecutorial destruction of evidence is at best mere speculation. Certainly, petitioner has had adequate time to produce some support for his allegation that the government tampered with the tape, or at least to establish that an issue of fact exists concerning the reliability of Professor Weiss's scientific examination. Absent some offer of proof to dispute the affidavits submitted by the government, the Court can only conclude that no such evidence exists. Since petitioner is unable to "set forth specific facts which he [would be] in a position to establish by competent evidence," the request for a hearing on this issue must be denied. *Dalli v. United States,* 491 F.2d at 760–61; *see DeVincent v. United States,* 632 F.2d 145, 146 (1st Cir.1980), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1981).

### B. *The Letters of Intent*

Petitioner's second *Brady* challenge concerns the Board of Education policy forbidding local school boards from issuing "letters of intent" to potential suppliers of educational materials. At trial, the government contended that petitioner's issuance of two such letters to BRL was indicative of his criminal intent. He now points to a letter written by the Acting Superintendent of District 23 to the Chancellor of the New York City Board of Education which, he argues, shows that members of his school district were unaware of the Board of Education's letter of intent policy. PX OO at 1. He also attaches to his petition copies of three letters of intent written by officials in other school districts between 1972 and 1973. PX MM, NN, LL. He contends that these documents could have been used by the defense either to show his lack of knowledge of Board policy, or to demonstrate that his conduct had little criminal significance.

Petitioner also contends that the materials cited above were withheld despite his specific request for "all documents obtained by subpoena served upon defendant, school board, banks where defendant and/or his wife had an account, the Board of Education and BRL." PX O at 3, ¶ 7. The very breadth of this request, however, demonstrates its generality: essentially it seeks the government's entire file. As the Second Circuit has defined it, "[a] specific request [under the *Agurs* guidelines] is one similar to the request made in *Brady* itself—a request for 'specific information' that gives the prosecutor 'notice of exactly what the defense desire[s].'" *Ostrer v. United States,* 577 F.2d at 786–87 (footnote omitted) (quoting *Agurs v. United States,* 427 U.S. at 106, 96 S.Ct. at 2398–99). This request certainly does not meet that standard.

Applying the less stringent materiality test to the documents cited by petitioner, it is again apparent that their nondisclosure does not rise to a violation of due process. At trial, the government proceeded on the theory that petitioner had *knowingly* violated Board of Education directives when he wrote two letters of intent to BRL in 1973. The defense did not argue at trial, nor does petitioner now contend, that he was unaware of this policy. To the contrary, the defense claimed throughout the trial that the letters to BRL were really "letters of recommendation" or "confirmatory memoranda." TT 1572–74, 1588, 1594, 1602. In fact, petitioner repeatedly testified that he never viewed these letters as letters of intent. TT 1577, 1591, 1614–21. Consequently, the only prejudice petitioner can now assert was his inability to change his story at trial. *Brady,* however, does not require the government to anticipate all possible defenses and provide the defendant with otherwise irrelevant information to bolster one possible factual theory, particularly where, as here, the theory itself—petitioner's lack of knowledge—is demonstrably implausible.

Indeed, it is difficult to imagine how petitioner was prejudiced by the nondisclosure of those materials. Given petitioner's posi-

tion as chairman of School Board 23 for over 3½ years, he, more than anyone else, knew who among his staff might be able to testify concerning the School Board's knowledge of the letter of intent policy. In fact, the Board of Education investigation into the BRL contract, which focused on petitioner's February 23, 1973 letter of intent, was made prior to petitioner's resignation from the Board. PX R, ¶ 2.2.1. Certainly, he was on notice of all the essential facts which would have allowed him to call appropriate witnesses concerning the letter of intent policy and take advantage of any exculpatory evidence they might furnish. Under these circumstances, the government did not violate its obligation to disclose exculpatory information to the defense. *United States v. Brown,* 582 F.2d 197, 200 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *United States v. Di Giovanni,* 544 F.2d 642, 645 (2d Cir.1976).

Nonetheless, assuming petitioner did claim that he had no knowledge of the Board of Education policy, the documents relied upon by petitioner would have been irrelevant to support such a claim. The Chancellor, Harvey Scribner, testified that the memorandum of June 4, 1971 banning the use of letters of intent was distributed to all community school board chairmen, including petitioner. TT 531. Materials written by other individuals which perhaps indicate their ignorance of this mandate simply do not bear on the issue of petitioner's knowledge. Similarly, evidence that other school districts continued to use letters of intent despite Board of Education policy and supposedly for non-criminal purposes, would not have been probative on the issue of petitioner's *mens rea.*

## C. The J.P. Company Bid

█ In his third *Brady* claim, petitioner contends that the government failed to disclose documents in its possession which "reveal that J.P. Company, not BRL, was originally awarded the [reading materials] contract." Petitioner's Memorandum of Law dated Oct. 2, 1981 at 2. The significance of this information, he argues, lies in BRL's

response to the purported J.P. Company contract award: instead of complaining to petitioner that he had breached their agreement by allowing J.P. Company to obtain the contract, BRL apparently sought relief directly from the New York City Board of Education. This response, he contends, could have been used at trial to indicate the absence of an actual conspiracy. In addition, he argues that these documents show that the government allowed James Phipps, a government witness, to falsely testify about the J.P. Company role in the 1973–74 contract process. Neither claim, however, finds support in the facts and are both refuted by the record.[5]

The testimonial and documentary evidence adduced at trial by both the defense and the prosecution demonstrated beyond peradventure that the 1973–74 reading materials contract was awarded to BRL by a majority vote of School Board 23 in executive session on July 31, 1973, and at a public meeting on August 9, 1973. TT 932, 1301. Indeed, petitioner testified that the Board "approved, passed and continued" the BRL program at these meetings. TT 1579–80. Similarly, both sides offered proof that the BRL program was submitted to the New York City Board of Education, TT 1394–97; 1402–03, and was in fact granted final approval by the New York State Department of Education. TT 1397.

In his attempt to circumvent the uncontradicted evidence at trial, petitioner primarily relies on a 1974 New York City Board of Education report summarizing that office's inquiry into the irregularities surrounding the J.P. Company bid. PX R. Contrary to petitioner's reading of this document, the report actually confirms the trial testimony outlined above. It states that, after the BRL program was approved by School Board 23 on July 31, 1973, *id.*, ¶ 2.3.4, and by the New York State Department of Education on September 1, 1973, *id.*, ¶ 2.5.1, and after all $418,000 worth of reading materials were delivered by BRL to District

23, *id.*, ¶ 2.3.5, J.P. Company, in November of 1973, submitted spurious bids and purchase orders, ostensibly on BRL's behalf, for payment. *Id.*, ¶ 2.2.2; *accord* PX OO at 2, ¶ 3 [Acting Superintendent of District 23's 1974 report of J.P. Company bidding irregularities]. BRL did not complain to petitioner because they did not need to: as of September 1, 1973 they already had an enforceable contract for the reading materials with District 23 and could assert their rights with the Board of Education. Indeed, the report itself indicates that the Board of Education *contacted* BRL as a part of its investigation into the J.P. Company bid, rather than BRL contacting the Board of Education for relief. *See* PX R, ¶ 2.3.

Moreover, James Phipps' testimony concerning the J.P. Company bid was entirely consistent with the documents now presented by petitioner. He testified on cross-examination that the J.P. Company purchase orders were designed to expedite the disbursement of funds to BRL for the materials previously delivered to District 23. TT 330–31. He assumed that J.P. Company was acting on BRL's behalf until he discovered that "something had gone wrong" with this plan; the principals of J.P. Company, Gary Penn and Stephen Savitsky, were attempting to obtain the District 23 contract for themselves as leverage to obtain "some remuneration coming to them from BRL." TT 332.

The report cited by petitioner confirms this testimony. It states that the J.P. Company purchase orders were prepared by the District 23 Title I coordinator at the request of Phipps, "even though [she] was aware that the [reading] materials were received in August-September 1973 by the schools from BRL." PX R, ¶ 2.2.2. Phipps, however, did not know that J.P. Company had actually submitted a bid, *id.*, lower than the one submitted by BRL, which the Title I coordinator thought was made on BRL's

---

5. In support of this claim, petitioner again relies upon his request for "all subpoenaed" materials as the means of invoking the more lenient standard of materiality. As discussed above, this discovery demand does not meet the specificity requirement announced by the Second Circuit in *Ostrer v. United States,* 577 F.2d at 786–87.

behalf. PX OO at 2, # 3. The report reveals, Penn and Savitsky later explained to the Acting Community Superintendent for District 23, "that getting the bid for the [reading] materials was related to the commissions they alleged were still owed them [by BRL]." PX R, ¶ 2.21, *accord* PX OO at 2, ¶ 3. While the FBI report cited by petitioner, PX Q, does not contain this admission, under the circumstances, its absence is not remarkable.

Finally, contrary to petitioner's allegations, Phipps never testified that J.P. Company was contractually authorized by BRL to bid on the reading materials contract; he only stated that it was an authorized representative of BRL in a general sense. TT 333, 334. Indeed, it is quite apparent from Phipps' testimony that BRL had only authorized J.P. Company to submit *fictitious* and *unenforceable* bids on the District 23 contract, and that BRL only took legal action against J.P. Company for breach of their distribution contract because that company actually attempted to consummate the District 23 contract. Moreover, the report cited by petitioner indicates that BRL's "new president" asserted J.P. Company's lack of authority under its distributorship contract to handle the reading materials as a means of insulating BRL from the problem J.P. Company's bid had produced in District 23. PX R, ¶ 2.3. All in all, it seems quite apparent that the entire J.P. Company-BRL bid rigging scheme was fully and fairly disclosed at trial.

### D. *The IRS Report*

■ Petitioner, in his fourth ground for relief, contends that government failure to provide him with an IRS report declining prosecution for income tax evasion deprived him of evidence favorable to the defense. PX QQ. Specifically, he argues that the report's recommendation against criminal tax prosecution was inconsistent with the trial testimony of Stanley Buchbinder of the IRS. In addition, he cites as exculpatory the reporting agent's conclusion that the allegations concerning the illegality of the

$5,000 BRL payment to petitioner "were unfounded."[6] Neither claim has merit.

To begin with, petitioner points to no specific exculpatory information in the IRS report to support the reporting agent's opinion that the $5,000 payment was not illegal. In fact, the report contains no support for this conclusion. Without some factual basis for the agent's opinion, the report by itself would not have been competent opinion evidence. Fed.R.Evid. 701. Indeed, even if supported, the reporting agent's opinion of the sufficiency of the evidence against petitioner would have been irrelevant to the question of petitioner's guilt or innocence and inadmissible at trial. Fed.R. Evid. 401. Quite simply, the conclusion of an IRS agent investigating a potential criminal tax evasion case on the merits of a conspiracy and extortion indictment brought by the United States Attorney's office lacks any probative value at the subsequent criminal trial.

Finally, nothing contained in the IRS report, including the reporting agent's recommendations, contradicted the trial testimony of any government witness. Stanley Buchbinder testified that if petitioner did indeed report the payment from BRL in Schedule C as petitioner claimed, this was not a proper entry since the income should have been reported on line 37 of Form 1040. TT 808. The thrust of this testimony was not petitioner's evasion of taxes but petitioner's possible criminal motivation in "hiding" the BRL fee in the gross receipts attributed to his legal services which he properly reported on Schedule C. On the issue of actual tax evasion, both the report and Buchbinder agreed that it was impossible to ascertain from petitioner's tax return whether the BRL payment had, indeed, been reported by petitioner. PX QQ at 13; TT 811.

### E. *Witness Agreements*

■ Petitioner's final *Brady* challenge accuses the government of failing to disclose the full extent of its agreement with

---

**6.** Petitioner concedes that no specific request for the IRS report was made.

one government witness, Allen Calvin. He claims that, in exchange for Calvin's testimony in petitioner's trial, the government immunized Calvin from prosecution in connection with an unrelated investigation conducted by the United States Attorney's Office into BRL's dealings with School District 9.[7] In support of this allegation, petitioner offers internal government memoranda indicating that the United States Attorney's Office had been granted authority by the Attorney General's Office to supply unknown witnesses with formal immunity. PX U. He also submits his own affidavit which states that Calvin's attorney informed him that Calvin had indeed received some form of immunity from prosecution in the District 9 investigation. PX A, ¶ 8.

Confronted with these allegations, the government has disclosed to petitioner and the Court a letter agreement executed on February 24, 1978, by Calvin and the United States Attorney's Office. RX A. This agreement allowed "Calvin to explain the nature and extent of his involvement in the relationship of BRL ... and New York City Community School District No. 9" with the understanding that any statements made "during the course of *this meeting* will not be used against him." *Id.* (emphasis supplied). The government, however, specifically retained the right to utilize "any leads, information or evidence derived from or a product of Allen D. Calvin's statements during the course of this meeting ... in any proceeding against him." No promise of immunity from prosecution in the District 9 investigation was contained in the letter.

While petitioner indirectly claims that Calvin's testimony against him was influenced by this extremely limited agreement, he offers no evidence to support his contention. To the contrary, the Court can see nothing in the arrangement itself to suggest that it could have affected Calvin's testimony at petitioner's trial. Since the agreement reached only statements made at the February 24th meeting, anything stated at trial would have been fair game in a subsequent prosecution. *United States v. Pellon,* 475 F.Supp. 467, 481 (S.D.N.Y.), *aff'd,* 620 F.2d 286 (2d Cir.1979) (informal immunity agreements strictly construed). Consequently, the Court can only conclude that this agreement was immaterial to Calvin's motives to testify and useless as impeachment evidence.

In response to the disclosure of the February 24, 1978 letter agreement, defendant has not come forward with any evidence to support his continuing suspicion of further government immunity agreements. Indeed, he concedes, as he must, that the defense was advised before trial that no promises of immunity were given to Calvin concerning the District 9 investigation, and that, in any event, the United States Attorney's Office had concluded before petitioner's trial that there was insufficient evidence to warrant an indictment against Calvin. RX C. Moreover, during trial, the defense expressly asked Calvin whether he was a target of the District 9 investigation and he replied that he was. TT 464.

Finally, and perhaps most importantly, the very language of the immunity authorization cited by petitioner leaves no doubt that the government never sought formal immunity for Calvin, or any other government witness. Each authorization contained an express limitation: immunity was to be sought "only on the condition that the Court does not apply *United States v. La Sovsa* and accordingly *order* ... [the witness] to testify." PX U (omission in original). This limitation was incorporated at the behest of the United States Attorney, because, in the opinion of the government, the witnesses to whom the authorization applied had already relinquished their fifth amendment privilege against self-incrimination by voluntarily testifying before peti-

---

**7.** Prior to trial, the government did disclose the informal May 27, 1975 letter agreement immunizing Calvin from prosecution in the District 23 investigation "so long as the information and/or testimony he provide[d was] truthful."

PX V. Counsel for defendant was of course free to explore the entire immunity issue during cross-examination, and was, in fact, invited to do so by the government prior to trial. TT 9.

tioner's grand jury investigation. *Id.* Consequently, under the authorizations the prosecutor had to first ask the Court to order the witnesses to testify before immunity could be granted. *Id.* Since no request was ever made, no formal immunity could have been granted in this instance.

Furthermore, the authorizations themselves militate against plaintiff's claim that an informal immunity agreement was reached with Calvin. Since the government had the authority to confer formal immunity to compel Calvin's testimony, and, indeed, thought that such testimony was no longer privileged, an informal arrangement would have been superfluous.[8]

Despite the strong evidence to the contrary, however, petitioner's motion for discovery seeks leave to depose Calvin with the hope of confirming the hearsay statements attributed to Calvin's attorney. While the Court understands petitioner's desire to pursue every possible lead, this request seems futile. Calvin has already testified that he was a target of the District 9 investigation, TT 618, and it is hard to imagine that his testimony has changed in the five years since trial.[9]

## II. *Juror Prejudice*

In his sixth claim for post-conviction relief, petitioner claims to have learned that racial prejudice may have motivated some jurors to convict him and influenced others to assent to the guilty verdict, thereby de-

nying him a fair trial. The information cited by petitioner is admittedly hearsay: he claims to have been informed by unspecified individuals that during the jury's deliberations, some unknown members of the jury "expressed extreme racial bias against him" and "employed derogatory racial epithets." Petitioner has submitted the affidavit of a non-juror which, he argues, corroborates his "informants" and mandates an evidentiary hearing into the issue. PX W. The Court, however, cannot agree.

■ Post-verdict inquiries into the internal deliberations of the jury or the mental processes of individual jurors are generally not permitted. *United States v. MacQueen*, 596 F.2d 76, 83 (2d Cir.1979); *King v. United States*, 576 F.2d 432, 438 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Dioguardi*, 492 F.2d 70, 79 (2d Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 606[04], at 606–25 to –26 (1981).

This judicial reluctance is based on a number of well-founded fears. As the Supreme Court observed some 60 years ago in an opinion equally applicable today:

"[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and

---

**8.** While informal immunity agreements do not provide a witness with statutory use immunity, *In re Corrugated Container Antitrust Litigation*, 662 F.2d 875, 887 (D.C.Cir.1981), *In re Corrugated Container Antitrust Litigation*, 644 F.2d 70, 78 n. 13 (2d Cir.1981), they do afford the witness the right to estop the government from reneging on the agreement. *E.g., Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963); *United States v. Pellon*, 475 F.Supp. at 479. Thus, for all practical purposes, an informal agreement can provide protections similar to the more formal grant of statutory immunity.

**9.** Even if petitioner could show that Calvin had enjoyed immunity in the District 9 investigation, government suppression of such evidence would not necessarily entitle petitioner to a new trial. *See Smith v. Phillips*, 455 U.S. 209,

102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). The Supreme Court has made it clear that credibility evidence becomes *Brady* material only when the "reliability of a given witness may well be determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In this case, the Court of Appeals has already characterized the most important portions of Calvin's testimony as "neither 'devastating' nor 'crucial'." *United States v. Wright*, 588 F.2d at 38. Indeed, the Court observed "that there was a sufficient basis for the jury to convict [petitioner] on both counts without any reference to [this testimony]." *Id.* at 39. Under these circumstances, non-disclosure of credibility evidence could hardly be called prejudicial.

many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference."

*McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); *accord United States v. Green,* 523 F.2d 229, 236 (2d Cir.1975) ("the protection of jurors from harassment requires that investigation into the subjective motivations and mental processes of jurors not be permitted"), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976).

In addition to the concern for the sanctity of the jury room and the unjustified harassment of jurors, it is well recognized that testimony concerning the subjective motivations of the jurors is of dubious value. 3 J. Weinstein & M. Berger, *supra,* ¶ 606[03] at 606–24. "Since inquiry into the thought processes of any individual is at best speculative and the cases suggest that it is relatively easy to convince a juror that he has acted mistakenly, a judge's ability to reconstruct the juror's thoughts at the time of his deliberation is doubtful and unverifiable." *Id.* (footnote omitted). Consequently, although testimony concerning the presence of improper outside influences have been accepted, *e.g., Parker v. Gladden,* 385 U.S. 363, 365, 87 S.Ct. 468, 470–71, 17 L.Ed.2d 420 (1966); *Mattox v. United States,* 146 U.S. 140, 148–49, 13 S.Ct. 50, 52–3, 36 L.Ed. 917 (1892), courts "have consistently refused to consider statements by jurors relating either to the subjective effect such influences might have had on them or to the mental process through which they arrived at their verdict." *United States v. Green,* 523 F.2d at 235.

The rule thus adopted in the federal courts, and since incorporated into the Federal Rules of Evidence, has been to preclude a juror from impeaching his own verdict with evidence of his subjective motivations. Rule 606(b) makes this rule explicit: "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith."

■ Despite the broad language of Rule 606(b), courts faced with the difficult issue of whether to consider evidence that a criminal defendant was prejudiced by racial bias in the jury room have hesitated to apply the rule dogmatically. *E.g., Tobias v. Smith,* 468 F.Supp. 1287, 1290 (W.D.N.Y.1979); *Smith v. Brewer,* 444 F.Supp. 482, 489 (S.D. Iowa), *aff'd,* 577 F.2d 466 (8th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978). *But cf. United States v. Brooks,* 677 F.2d 907, 911 (D.C.Cir.1982) (evidence of personal prejudice barred by Rule 606(b)); *United States v. Duzac,* 622 F.2d 911 (5th Cir.) (same), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). As the Supreme Court noted in *McDonald v. Pless,* "[t]here may be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice." 238 U.S. at 268–69, 35 S.Ct. at 785. Certainly, if a criminal defendant could show that the jury was racially prejudiced, such evidence could not be ignored without trampling the sixth amendment's guarantee to a fair trial and an impartial jury. *See Tobias v. Smith,* 468 F.Supp. at 1290; *Smith v. Brewer,* 444 F.Supp. at 490. *Cf. Rose v. Mitchell,* 443 U.S. 545, 556–57, 99 S.Ct. 2993, 3000–01, 61 L.Ed.2d 739 (1979) (racial discrimination in selection of grand jury). Given the potential constitutional difficulties in applying Rule 606(b) to all allegations of racial prejudice, the better rule, this Court believes, is to analyze each such claim on a case-by-case basis.

■ The real question, therefore, is whether petitioner has made a sufficient showing of racial prejudice to justify an evidentiary hearing into his allegations. In cases involving the potential mental incompetence of a juror in a criminal case, the Second Circuit has required " 'clear evidence,' 'strong evidence,' 'clear and incontrovertible evidence,' 'substantial if not wholly conclusive evidence' " that it was more likely than not the juror was incompetent and that his incompetence affected the actual deliberations before allowing any examination of the juror to take place. *King v. United States,* 576 F.2d at 438 (quoting *United States v. Dioguardi,* 492 F.2d at 79); *accord Sullivan v. Fogg,* 613 F.2d 465, 467 (2d Cir.1980). Since this high standard was imposed apparently to serve as an alternative screening mechanism to the absolute testimonial preclusion of Rule 606(b), *see Sullivan v. Fogg,* 613 F.2d at 467, it would seem equally applicable to any request to inquire into the subjective biases of a juror.

In this case, the only evidence indicative of racial prejudice on the part of a juror was a comment made by one juror to a non-juror, presumably before the end of trial, that he thought "the Black Bastard is guilty." PX W. The remark was made while the juror was at work, apparently during a break in the trial, in response to a fellow employee's statement advising the juror to find petitioner *not* guilty. Given the circumstances surrounding the utterance of this isolated racial epithet, the remark can hardly be called "clear and incontrovertible evidence" that it is more likely than not that this juror was racially biased. Certainly, it fails to support the inference urged by petitioner that this particular juror's assent to a guilty verdict was motivated by racial considerations, or that he or another juror introduced petitioner's race into the actual jury deliberations. Without that crucial connection or more substantial evidence of bias, petitioner's claim lacks the substance necessary to justify the extraordinary step of ordering the jurors to submit to an examination into their racial beliefs.

### III. *Prosecutorial Conflict of Interest*

■ In his seventh and final claim, petitioner renews his pre-trial claim that his prosecution was instituted by the United States Attorney's Office for improper political reasons. This argument was rejected by both this Court and the Court of Appeals as insufficient to state a claim either under the rubric of selective prosecution or under the more novel legal theory of prosecutorial conflict of interest. To resuscitate his original allegation of bad faith prosecution, petitioner argues that he has uncovered new evidence which undercuts the factual basis for these previous opinions. This Court cannot agree.

In his original pre-trial motion, petitioner contended that the wife of the Assistant United States Attorney in charge of the investigation into the BRL payment, Carol Puccio, was a political opponent of his, and somehow influenced the government's decision to pursue an indictment against him. Based upon the personal assurance of David G. Trager, Esq., who was then the United States Attorney for this district, and the results of the Justice Department's Council on Professional Responsibility investigation into petitioner's allegations, this Court concluded that Mr. Trager was personally making the prosecutorial decisions, not Mr. Puccio, and that these decisions had been based upon an objective review of the facts. Consequently, this Court was satisfied that Mrs. Puccio's alleged influence with her husband did not affect the ultimate determination to prosecute. The Court of Appeals reached a similar conclusion when it ruled that petitioner had failed to show even the appearance of impropriety under the American Bar Association's Standards Relating to the Prosecution Function.

The new evidence now cited by petitioner provides no reason for this Court to question either the statements of Mr. Trager, or the findings of the Justice Department. Although petitioner has provided a veritable mountain of documents to support his contention that Mrs. Puccio was a "complaining witness" within the meaning of the ABA standards cited by the Court of Ap-

peals, none of these documents indicates that she brought the BRL payment to the attention of the United States Attorney's Office. Without evidence to support even an inference of bias under the ABA standards, this Court can see no valid reason to entertain once again petitioner's claim of prosecutorial conflict of interest. See *Dalli v. United States*, 491 F.2d at 760–61 (re-institution of previously dismissed claim requires offer of proof that would if established entitle a § 2255 petitioner to relief).

### Conclusion

In sum, the evidence presented by the government at trial was substantial. When viewed in light of the record, the issues raised by the present petition, including claims that the government failed to disclose evidence favorable to the defense, have revealed nothing which would entitle petitioner to a new trial, nor have factual questions been raised which would necessitate further discovery or an evidentiary hearing. Consequently, the motion for further discovery is denied and the petition is dismissed.

SO ORDERED.