**UNITED STATES of America, Appellee,**

v.

**Charles GREEN et al., Appellants.**

**Nos. 1005, 1006, Dockets 75–1037, 75–1074.**

United States Court of Appeals, Second Circuit.

Argued May 30, 1975.

Decided Aug. 29, 1975.

Certiorari Denied Jan. 19, 1976.

See 96 S.Ct. 858.

---

230

Anthony N. Del Rosso, Garden City, N. Y., for appellants Piccora and Pacilio.

Vincent L. Verdiramo, Jersey City, N. J., on the brief, for appellants Green, Smith and Grasso.

Samuel R. DeLuca, Jersey City, N. J., on the brief, for appellant Coughlin.

Lauren S. Kahn, Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., for the Eastern District of New York, Peter M. Shannon, Victor D. Stone, Dept. of Justice, Washington, D. C., David J. Ritchie, Sp. Atty., Dept. of Justice, Brooklyn, N. Y., on the brief), for appellee.

Before CLARK, Associate Justice,* and HAYS and MANSFIELD, Circuit Judges.

HAYS, Circuit Judge:

Raymond Coughlin, Charles Green, Albert Grasso, Neil Pacilio, Carmine Piccora, and Fred Smith appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, after a twelve-week jury trial. Appellants were each convicted of conspiring to violate 18 U.S.C. § 659 (1970),[1] which prohibits the theft of goods in interstate or foreign commerce. Appellant Coughlin was also convicted of a substantive violation of § 659.[2] We affirm.

## I.

At the trial, the Government introduced evidence of a large-scale conspiracy among the officers and employees of Frigid Express, a Jersey City trucking company, to steal frozen seafood from Brooklyn Port Authority Pier 11 and other New York City piers. John Valentine, a former truckdriver for Frigid, testified that sometime in 1964 or 1965 Pasquale Macchirole called a meeting of all Frigid drivers. At the meeting Macchirole told a group of about 25 drivers, including Valentine and appellant Pacilio, that in the future any driver stealing seafood from the piers would be required to give half his profits to Frigid. Between 1965 and 1972 Valentine continued to steal merchandise as he had before. He tried to avoid splitting his profits with Frigid but when pressed he occasionally turned over some of his stolen

---

* Of the United States Supreme Court (ret.), sitting by designation.

1. 18 U.S.C. § 659 (1970) states, in part:

 "Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property; or

 "Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen . . . . .

 "Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both . . . . ."

2. Appellants along with 16 co-defendants were charged in a fourteen-count indictment with conspiracy and with substantive violations of 18 U.S.C. §§ 549, 659, 1962, and 2314 (1970). Defendants Bencivenga, Lester, Lofton, and Ruggiero pleaded guilty to one count of seafood theft and testified for the Government. Seven defendants, including Pasquale Macchirole and Alfred Smith, brother of appellant Fred Smith, were severed for a separate trial. At the close of the Government's case the court dismissed four counts in the indictment charging violation of 18 U.S.C. § 2314 (interstate transportation of stolen goods), two counts under 18 U.S.C. § 549 (theft from customs custody), and one count under 18 U.S.C. § 1962 (pattern of racketeering activity). All counts against defendants Conte, Danduono, and Questel were also dismissed. The jury acquitted defendants Bamonte and John Macchirole of all counts against them and acquitted all the appellants other than Coughlin of the remaining substantive counts against them.

goods to appellant Piccora and codefendant Questel at the Frigid cold storage room. Appellant Pacilio frequently spoke to Valentine on behalf of Macchirole urging him to pay Macchirole half of whatever Valentine was selling on his own. Valentine would comply by sending money or merchandise to Macchirole through Pacilio.

Until 1972 the drivers stole seafood by loading extra cases onto their trucks at the piers and sometimes paying off the checkers who were supposed to tally the loads. Valentine testified to three specific incidents in which appellants Grasso, Piccora, Pacilio, Smith, and Green each assisted him in the theft of seafood either by paying off a checker or by unloading and disposing of stolen goods.

Beginning in 1972 the drivers devised a new method of stealing seafood which did not require the complicity of the checkers and which took advantage of the procedures used at the piers for loading trucks. When a truckdriver arrives at Brooklyn Pier 11, the watchman makes out a gate pass for him and photographs him with a regiscope machine. After clearing customs the driver loads his truck while the checker makes out a tally ticket. The tally ticket includes the company number, the truck's license plate number, and the number of cases in the load. The checker also notes on the tally the number of recoopered, or partially filled, cases and the number of packages contained in each. After the checker signs the tally he returns it to the driver who goes back to the customs inspector and then to the delivery office, where the tally is entered in the delivery book. A representative of the company, usually the driver, signs the book, and the driver leaves the pier, surrendering his gate pass on the way out.

As the Government established through the introduction of the tallies and the testimony of checkers, the notations on the tallies for Frigid cargo were frequently changed between the time they were made by the checkers and the time the tallies were entered by the driv-

ers in the delivery book. The effect of the changes, which were attributed to Frigid's drivers, was to increase the proportion of unfilled cases of seafood listed on the tally. According to Government witnesses the drivers after leaving the pier would "slack" the cargo by removing packages of seafood from full cases to correspond with the altered tallies. The extra packages would then be sold either by the drivers themselves or by Frigid.

The Government introduced the testimony of several Frigid employees as well as a handwriting expert to link the appellants with this phase of the conspiracy. Co-defendant Lester, who pleaded guilty to seafood theft, testified that after slacking a case in March or April 1972, he sold it and paid Pacilio half his profits. Pacilio took the money and told him that next time he should give the goods to Piccora or co-defendant Questel because they could get a better price for it. Several times in April or May Lester followed those instructions.

Anthony Bencivenga, another co-defendant who pleaded guilty to seafood theft, testified that in April 1972 Pacilio was concerned with getting half the profits of the black drivers who he suspected were stealing. One night Pacilio asked appellant Smith and his brother, co-defendant Alfred Smith, to show Bencivenga their altered tallies. He then told them that Bencivenga would be in charge of stealing. About a week later he introduced Bencivenga to the other Frigid drivers and told them that Bencivenga would help them with their slacks and that they would get half of whatever they stole. Piccora was also told to keep whatever Bencivenga gave him in the freezer for Pacilio.

Document examiner Drew Sommerford testified that a tally from Pier 11 dated July 25, 1972, had been altered by appellant Coughlin. Bencivenga testified that later that day he, Coughlin, and the Smith brothers made up slack cases so that the shipment would correspond to the altered tallies and the resulting surplus could be sold. Sommer-

ford also testified that tallies prepared on August 23, September 12, and September 22, 1972, had been altered by Coughlin. Bencivenga testified that on September 22 he had originally arranged to send appellant Green to help Coughlin make up the slacks for that day without having to come back to Frigid, but that the plans were changed and Coughlin eventually brought the stolen goods back to the freezer at Frigid as Bencivenga had instructed.[3]

Appellants argue that the evidence was insufficient to establish any form of conspiracy prior to 1972 and that the non-hearsay evidence was sufficient to establish a post-1972 conspiracy only with regard to appellants Pacilio and Smith. They contend, therefore, that it was error for the court to admit evidence of criminal activity which took place prior to 1972 and that it was also error to utilize the co-conspirator exception to the hearsay rule to admit out-of-court statements of alleged co-conspirators into evidence against appellants other than Pacilio and Smith.

■ Appellants' contentions are without merit. The Government introduced ample non-hearsay testimony to establish a conspiracy dating at least from 1965 through 1973 and including each of the appellants.[4] The out-of-court statements of co-conspirators made in furtherance of the conspiracy were thus admissible. See, e. g., *United States v. Nixon,* 418 U.S. 683, 701, 94

S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Valentine's testimony concerning the meeting called by Pasquale Macchirole established the framework for the conspiracy. His testimony also linked each of the appellants with the exception of Coughlin to pre-1972 activities in furtherance of the conspiracy. The testimony of Bencivenga and other Government witnesses established that the conspiracy continued through 1972 and 1973, with each of the appellants participating. The fact that new members joined the conspiracy as time went on and old members may have dropped out does not preclude a finding that a single, ongoing conspiracy existed. *United States v. Nasse,* 432 F.2d 1293, 1297 (7th Cir. 1970), cert. denied, 401 U.S. 938, 91 S.Ct. 927, 28 L.Ed.2d 217 (1971). We hold that since there was sufficient non-hearsay evidence of a conspiracy including each of the appellants, dating from 1965 through 1973, evidence of related criminal activity throughout that period and the out-of-court statements of co-conspirators were admissible.[5]

■■ Appellants also argue that the evidence was insufficient to sustain a conviction for conspiracy because there was no evidence of an intent to steal from foreign commerce. We disagree. A substantive violation of 18 U.S.C. § 659 does not require knowledge of the

---

3. Count 10 of the indictment, of which Coughlin was convicted, charged him with the September 22 theft.

4. Appellants argue that we must assume that the district judge found only appellants Pacilio and Smith to have been involved in the conspiracy because those were the only appellants he specifically mentioned when he ruled during the trial that a conspiracy had been established for the purpose of admitting the statements of co-conspirators. We disagree. If out-of-court statements by alleged co-conspirators are testified to in the course of a conspiracy trial, the court may wait until all the evidence is in to determine if a conspiracy has been sufficiently established by non-hearsay evidence to allow the jury to consider the

hearsay testimony as well. If the judge does allow the jury to consider the out-of-court statements, we must assume that he made the necessary finding and our only task is to decide if he had reasonable grounds for doing so. See *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

5. We also reject the contention that there was insufficient evidence of an explicit agreement on the part of each appellant to sustain their convictions for conspiracy. "The existence of an agreement may be shown by circumstances indicating that criminal defendants acted in concert to achieve a common goal." *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974).

interstate or foreign character of the goods. *United States v. Houle,* 490 F.2d 167, 170 (2d Cir. 1973), cert. denied, 417 U.S. 970, 94 S.Ct. 3174, 41 L.Ed.2d 1141 (1974); *United States v. Tyers,* 487 F.2d 828, 830 (2d Cir. 1973), cert. denied, 416 U.S. 971, 94 S.Ct. 1995, 40 L.Ed.2d 560 (1974). It is therefore unnecessary to prove such knowledge in order to establish a conspiracy violation. *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Podell,* 519 F.2d 144 (2d Cir., 1975). Furthermore, the jury could well have inferred from evidence relating to bills of lading, customs procedures, and the site of the thefts that appellants did intend to steal from foreign commerce. Cf. *United States v. Houle,* supra at 170.

## II.

Appellants' primary contention is that they are entitled to a new trial because the court set a time limit on the jury's deliberations and thereby coerced a verdict. The facts relevant to this claim are as follows: Before commencement of the trial, the court excused three jurors at their request and seated the three alternates in their places. No other jurors were available that day to serve as alternates. Despite objections by the Government and counsel for co-defendant John Macchirole, the court decided to proceed without alternates. The trial took longer than expected and on July 15 juror No. 5 told the judge that she

had planned to leave for Canada on July 19 but could delay her departure for a few days. The judge responded by telling her that the case would be submitted to the jury by Tuesday, July 23. The court promised that Tuesday would be her last day in court and that she would be leaving on Wednesday. Similar assurances were given to juror No. 11. In a later discussion with defense counsel the district judge stated that he only meant that the jury would get the case by Tuesday, not that their deliberations would have to be concluded by Tuesday. Defense counsel stated that the jury had the impression that Tuesday would definitely be its last day, but no one suggested that the court clarify to the jury that it was only assured of getting the case by Tuesday.

On the morning of July 23, the court submitted the case to the jury, as promised. In his charge, the district judge instructed the members of the jury to decide the case on the evidence and to listen to each other's arguments with an open mind to see if they could agree in "good conscience." No time limit was set on the jury's deliberations, and nothing was said about the need to meet any sort of deadline. The jury received the case at 12:40 P.M. and returned a verdict at 9:50 P.M.

In a post-trial motion appellants asked for a new trial on the ground that the court had coerced a verdict. With the notice of motion appellants submitted an affidavit from juror Canegallo[6] stating

---

**6.** The affidavit stated:

"During the trial, jurors five and eleven made known to the Court that they had vacation plans to leave the country on July 24, 1974 and were assured by the Court that they would not serve beyond July 23, 1974.

"The jury's deliberations began on July 23, 1974 at about 12:40 p. m. Both jurors five and eleven made it quite clear to all other jurors that no matter what occurred, they would be leaving on their vacations to Canada on the morning of July 24, 1974.

"After one poll of the jury, there were eight jurors in favor of acquittal of all defendants with the exception that I felt defendant RAYMOND COUGHLIN was guilty of the charge of conspiracy and there were

four jurors in favor of conviction of all the defendants on all counts.

"Thereafter another vote was taken and now ten jurors were in favor of acquittal of all defendants and two jurors (jurors two and twelve) were firmly holding out for conviction of all defendants on all counts.

"After much discussion, jurors two and twelve would not change their firm position of guilty on all counts.

"Considering the above, and the time was approximately 7:30 p. m., I thought that further discussion was useless and on three separate occasions I told the jury foreman that the jury should report to Judge Costantino that the jury was a hung jury and hopelessly deadlocked.

that the jury's verdict was a compromise between ten jurors who were for acquittal of all defendants except Coughlin and two jurors who were for conviction of all defendants on all counts. He claimed that the compromise was the result of the obstinacy of juror No. 12 in insisting on conviction and the fear that if the jurors reported to the court that they were deadlocked they might have to stay overnight, interfering with the vacation plans of jurors 5 and 11. The court denied the motion on the grounds that its statements were not coercive when read in context and that the juror's affidavit should not be considered in determining the mental processes through which the jury arrived at its verdict.

 Appellants argue that the district court should have considered the affidavit as proof of the coercive effect of the court's earlier statements. We disagree. The federal courts have rejected the iron-clad rule that a jury will never be heard to impeach its own verdict. *McDonald v. Pless*, 238 U.S. 264, 268–69, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *Mattox v. United States*, 146 U.S. 140, 148, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *Jorgenson v. York Ice Machinery Corp.*, 160 F.2d 432, 435 (2d Cir.), cert. denied, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947). However, while the courts have accepted the testimony of jurors to establish that impermissible outside influences were brought to bear on a jury, see, e. g., *Mattox v. United States*, supra, 146 U.S. at 148–49, 13 S.Ct. 50 (newspaper editorials on a murder case), they have consistently refused

to consider statements by jurors relating either to the subjective effect such influences might have had on them or to the mental processes through which they arrived at their verdict. See *Mattox v. United States*, supra at 148–49, 13 S.Ct. 50; *United States v. Howard*, 506 F.2d 865, 868–69 (5th Cir. 1975); *Downey v. Peyton*, 451 F.2d 236, 239 (4th Cir. 1971); *Miller v. United States*, 403 F.2d 77, 83 n.11 (2d Cir. 1968); *Rotondo v. Isthmian Steamship Co.*, 243 F.2d 581, 583 (2d Cir.) (per curiam), cert. denied, 355 U.S. 834, 78 S.Ct. 53, 2 L.Ed.2d 45 (1957). This court on a number of occasions has stressed that the strong public interest in the integrity of jury verdicts and the protection of jurors from harassment requires that investigation into the subjective motivations and mental processes of jurors not be permitted. See *Miller v. United States*, supra at 82, 83 n.11; *United States v. Crosby*, 294 F.2d 928, 950 (2d Cir. 1961), cert. denied, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); Cf. *United States v. Dioguardi*, 492 F.2d 70, 79–80 (2d Cir.), cert. denied, 419 U.S. 829, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). We hold that Canegallo's affidavit was properly rejected as a basis for determining the effect of the court's statements on the minds of the jurors.

 Even considering the affidavit, it appears that the jurors arrived at a compromise verdict not because the trial judge had set a time limit on their deliberations but on the contrary because they thought that the judge would send them back for further lengthy, and probably futile, deliberations if they reported to him that they were deadlocked. Evi-

"At this point, juror twelve said that if we so informed the Judge that he could possibly order us back to deliberate for six more hours and may even order us to stay overnight. When jurors five and eleven heard this, they immediately protested to the other jurors. Jurors five and eleven again stated that they had to leave this evening as their planned vacations were to start the very next day. Juror twelve then remarked that he did not care if the jury's deliberations lasted another month as he had no plans.

"Therefore, the fact that jurors five and eleven had to leave that evening; the firm

stand of jurors two and twelve for conviction of all defendants; the fact that all jurors except myself were against informing the Judge that we were deadlocked and seeing that we did not have ample time to freely deliberate, the ten jurors for acquittal of all defendants except defendant COUGHLIN sought and finally reached a compromise verdict with jurors two and twelve at 9:30 p. m.

"If there had not been a pressing time limit for deliberations, I would have held out for a hung jury but due to the facts stated I did not do so."

dence that the jurors on their own agreed to a compromise verdict does not warrant a new trial. *Jorgenson v. York Ice Machinery Corp.,* supra at 435. Cf. *Grace Lines, Inc. v. Motley,* 439 F.2d 1028, 1031–32 (2d Cir. 1971); *United States v. Grieco,* 261 F.2d 414, 415 (2d Cir. 1958) (per curiam), cert. denied, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959) (juror's motive for agreeing to the verdict is not grounds for reversal, absent actual coercion).

■■■■■ Appellants argue in the alternative that wholly aside from the affidavit, they are entitled to a new trial on the ground that the court's statements were inherently coercive. We agree that the proper approach in this case is to determine whether the court's statements were coercive, regardless of the subjective effect on the jurors. See *Miller v. United States,* supra at 83 n.11. However, we hold that the statements of the district judge, taken in context, did not set a time limit on jury deliberations and were not inherently coercive.

At no time did the district judge instruct the jury that it must return a verdict by a certain time. On the contrary, the court instructed the jurors to decide the case solely on the evidence, to listen to the arguments of their fellow jurors, and to decide whether they could "with good conscience agree." The remarks made on July 15 to jurors 5 and 11 were assurances by the judge that he would not interfere with their vacation plans beyond July 23. His purpose at that time was clearly not to instruct the jury as to the course of its deliberations, but rather to urge the jurors to bear with him a little longer and to prod the lawyers on both sides to proceed expeditiously. When the jury received the case on July 23 its only duty as stated by the court was to decide the case properly.

Appellants cite a number of cases for the proposition that it is coercive for the trial judge to set a time limit on the jury's deliberations. However, in each of those cases the courts were dealing either with an explicit time limit placed directly on the jury's deliberations, *Goff v. United States,* 446 F.2d 623, 626 (10th Cir. 1971) (1 hour); see *United States v. Landsdown,* 460 F.2d 164, 169 n.3 (4th Cir. 1972) (10 minutes), or with a charge which taken in context was likely to give the jury the impression that it was more important to be quick than to be thoughtful. *United States v. Flannery,* 451 F.2d 880, 883 (1st Cir. 1971); *United States v. Diamond,* 430 F.2d 688, 696–97 (5th Cir. 1970); *Burroughs v. United States,* 365 F.2d 431, 433–34 (10th Cir. 1966). In this case, the court did not instruct the jury to decide the case within a certain time. Furthermore, the court's final charge to the jury clearly placed the emphasis on a reasoned decision according to the evidence, not on time constraints. We therefore hold that the district court's statements to the jury, in context, were not coercive. See *United States v. Miller,* 478 F.2d 1315, 1320 (2d Cir.), cert. denied, 414 U.S. 851, 94 S.Ct. 144, 38 L.Ed.2d 100 (1973).

### III.

■■■■■ Appellants claim that the district court made a number of erroneous rulings which warrant reversal. First, they argue that it was reversible error for the court to allow Government witness Drew Sommerford to testify as a handwriting expert. We disagree. The question of whether a witness qualifies as an expert is within the discretion of the trial judge. See, e. g., *United States v. Burden,* 497 F.2d 385, 387 (8th Cir. 1974); *United States v. Trice,* 476 F.2d 89, 91 (9th Cir.), cert. denied, 414 U.S. 843, 94 S.Ct. 103, 38 L.Ed.2d 81 (1973). At the time he testified Mr. Sommerford was employed as an examiner of questioned documents by the Bureau of Alcohol, Tobacco, and Firearms of the United States Treasury. He had completed a study program in document examination and a three-year apprenticeship in the field, and he had been qualified as a full-fledged document examiner for 14 months. Handwriting identification was

a major part of his training and experience. It was certainly reasonable to conclude based on his qualifications that Sommerford's testimony would aid the jury. The district court therefore did not abuse its discretion by allowing him to testify as an expert witness. See *United States v. Dellinger*, 472 F.2d 340, 383 (7th Cir. 1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973).

Appellants also argue that the district court committed reversible error by preventing them from cross-examining Bencivenga on his alleged consultations with a psychiatrist. The Government objected to the questioning as irrelevant and the district court barred the inquiry both on the ground that it violated the physician-patient privilege and on the ground that it exceeded the proper scope of cross-examination.

The district judge has broad discretion in restricting the scope of cross-examination. E. g., *United States v. Kahn*, 472 F.2d 272, 281 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); *United States v. Mahler*, 363 F.2d 673, 676–78 (2d Cir. 1966). In his offer of proof, defense counsel stated that Bencivenga's testimony about his psychiatric treatment might "help to question his credibility." While the court did not allow this particular line of questioning, it did permit extensive cross-examination of Bencivenga in which the defense attacked his credibility on the grounds, among others, that he was an habitual thief, he had a motive to lie, he had made prior inconsistent statements, and his memory was suspect.

At least one defense attorney doubted the need for Bencivenga's testimony concerning the psychiatric consultations on the ground that the jury already "knows he's crazy" and that it "thinks he is a liar anyway." In view of the extensive cross-examination on the question of Bencivenga's credibility, the uncertain nature of the defense's offer of proof, and the possible prejudicial effects, we hold that the court did not abuse its discretion in restricting the scope of cross-examination.[7] See *Natvig v. United States*, 98 U.S.App.D.C. 399, 236 F.2d 694, 697 (1956), cert. denied, 352 U.S. 1014, 77 S.Ct. 567, 1 L.Ed.2d 551 (1957).[8]

IV.

Finally, appellants contend that the district court should have declared a mistrial because of numerous instances of alleged prosecutorial misconduct. We find a number of these claims to be totally frivolous. Several other claims involve questionable conduct on the part of the prosecutor. However, in each such instance the court effectively cured whatever prejudice may have otherwise resulted by admonishing the prosecutor or by instructing the jury to disregard the improper remarks. We therefore find no basis for ordering a new trial on the grounds of prosecutorial misconduct. See generally *United States v. Bivona*, 487 F.2d 443, 445–47 (2d Cir. 1973).

We have considered the other arguments raised by the appellants and find them to be without merit.[9]

Affirmed.

---

**7.** In light of this holding, we need not reach the question of whether Bencivenga was privileged to refuse to answer questions about his consultations with a psychiatrist. But see *United States v. Mancuso*, 444 F.2d 691, 694–5 (5th Cir. 1971); *United States v. Mullings*, 364 F.2d 173, 176 n.3 (2d Cir. 1966).

**8.** Appellant Smith also claims that the district court erred by proceeding with the cross-examination of Government witness Lester in the absence of his counsel. We disagree. On June 25 Smith's counsel, Mr. Verdiramo, informed the judge that he would be unable to be in court the next day. Attorneys DeLuca and Margulies, who were representing other

defendants, agreed to represent Verdiramo's clients in his absence. All of Verdiramo's clients including Smith explicitly waived their right to have him present. The next day Smith informed the court that he wished to have Lester cross-examined by his own counsel as well as by the other defense attorneys. However, when Verdiramo returned on the following day, he did not ask for permission to reopen the cross-examination. Smith may not now claim that he was prejudiced by Verdiramo's absence.

**9.** Appellant Coughlin argues that the court impermissibly amended the indictment by eliminating the names of certain of his co-defend-

MANSFIELD, Circuit Judge (concurring):

I disagree with the majority's view regarding the trial judge's fixing of a time limit upon the jury's deliberations. In my view, the judge improperly set a time limit for completion of trial and jury deliberations, with the result that in this complex case which required over 10 weeks for trial the jury was forced to reach a verdict within 12 hours.

On July 15, 1974, after trial had been in progress for more than 9 weeks, the trial judge, in response to expressions of concern by one of the twelve jurors regarding her vacation plans, promised her that he would finish the case by Tuesday, July 23rd so that she could leave on her vacation by Wednesday, July 24, 1974.[1] The colloquy in which this promise was made was as follows:

THE COURT . . .

"If we didn't finish on Friday, more than likely we would finish by Monday or Tuesday of the following week. You will give me until Tuesday?

"JUROR NO. 5: Yes.

"THE COURT: How does that sound?

"JUROR NO. 5: That is fine with me, Judge.

"MR. ROSEN: That is very fair, Judge.

"THE COURT: That is my promise to you. If it's not, you are going to be leaving—Tuesday will be the last day you are here. You will be leaving on Wednesday, I make that promise to you." (Tr. 3953).

When Juror No. 11 then advised that she, too, was supposed to go on vacation the following week the court made the identical promise, stating "I promised her [Juror No. 5] by Tuesday the case would be over and they would be out of here by Wednesday next week. Is that okay with you, too?" Juror No. 11 replied: "That will be okay". (Tr. 3954).

The case was submitted to the jury on Tuesday, July 23, 1974 at 12:40 p. m., leaving the jury less than 12 hours to deliberate if the trial judge should adhere to his promise. It is true that before submitting the case to the jury the judge gave the standard charge with respect to the jurors' deliberation duties, including the duty not to surrender an honest conviction, the duty to listen to each other, and the duty not to adhere stubbornly to a position shown to be erroneous. However, the judge's promise that the jury would "be leaving" and "would be out of here" by Wednesday, July 24th, could well have been reasonably interpreted by the jurors as meaning that they were expected by the court to hurry up their deliberations and reach a verdict on July 23rd, or else they would be discharged. Jurors who needed more time for deliberations with respect to the extensive evidence heard over ten weeks in this complex case would thus be deprived of the opportunity for the careful deliberation to which they were entitled and which the case deserved.

The jury reached its verdict at 9:50 p. m., approximately two hours before the deadline fixed by the court. Whether

---

ants when reading the substantive counts to the jury. The names were of co-defendants either not on trial with appellants or against whom sufficient evidence of guilt had not been introduced. See note 2 supra. Eliminating such names was a permissible excision of surplusage since it did not add to the charges against the remaining defendants. See *United States v. Musgrave,* 483 F.2d 327, 338–39 (5th Cir.), cert. denied, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973).

**1.** The predicament in which the court found itself, which resulted in its promising a dead-

line for decision, was of its own making. At the outset of trial, before any testimony was taken, the court used all three alternates to fill the places of jurors who were excused, leaving no alternates. Rather than delay trial until additional jurors could be summoned for the selection of more alternates, the court chose, after discussion of the risk that loss of another juror during the long trial could lead to a declaration of mistrial, to proceed with 12 jurors.

the result would have been different if the jurors had not been faced with a deadline we cannot determine. However, regardless of what the result would have been if the court had allowed ample time for deliberations it was improper for the trial judge to have put pressure on the jurors in this fashion to arrive at a verdict by a given time, *United States v. Diamond,* 430 F.2d 688, 695–97 (5th Cir. 1970).

". . . The implicit suggestion, although doubtless unintended, was that it was more important to be quick than to be thoughtful."

*United States v. Flannery,* 451 F.2d 880, 883 (1st Cir. 1970).

Despite the trial court's erroneous fixing of a time limit on jury deliberations, I concur in the result reached by the majority, since the defendants, either as a matter of strategy or for other reasons best known to themselves, acquiesced in the time table fixed by the court. Although counsel for defendant John Macchirole, who was acquitted, did at one point express apprehension about the coerciveness of the July 23rd deadline he took no steps to have the error corrected, such as by requesting the court to instruct the jury that it should not feel compelled to reach a verdict by July 23rd and that if it did not reach a verdict it would have to continue deliberations thereafter. If a request for such instruction had been made, the trial judge might well have granted it, since the record indicates that he was under the erroneous impression, notwithstanding his earlier, unequivocal promise to the jury, that he had merely advised the jurors that "they would have the case by Tuesday [July 23rd]" and not that they would reach a decision on that date and leave on Wednesday. Absent a clear objection by the defendants and a request for a curative instruction, the issue was waived. *United States v. Indiviglio,* 352 F.2d 276 (2d Cir. 1965), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).