**UNITED STATES of America**

v.

**Anthony SALERNO, et al., Defendants.**

**No. 86 Cr. 245 (MJL).**

United States District Court,
S.D. New York.

Oct. 12, 1988.

Rudolph W. Giuliani, U.S. Atty., New York City, by Alan M. Cohen, Mark R. Hellerer, Asst. U.S. Attys., for U.S. of America.

John Jacobs, New York City and A. Cardinale, Boston, Mass., for defendant Anthony Salerno.

Gustave Newman, New York City, for defendant Vincent Di Napoli.

Robert Ellis, New York City, for defendant Louis Di Napoli.

Jay Goldberg, New York City, for defendant Mathew Ianniello.

Marvin Segal, New York City, for Nicholas Auletta.

Frederick P. Hafetz, Goldman & Hafetz, New York City, for defendant Edward Halloran.

Patrick M. Wall, New York City, for defendant Alvin Chattin.

Henry Putzel, III, New York City, for defendant Richard Costa.

Ronald Russo, New York City, and Albert Gaudelli, Flushing, for defendant Neil Migliore.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Defendant Anthony Salerno moves for a new trial and for the recusal of this Court in connection with the determination of the same motion. The other convicted defendants have joined or are deemed to have joined in the motion. For the reasons set forth below, we find that the evidence submitted by the defendants in support of their motion lacks sufficient reliability, clarity, and strength to warrant further inquiry. Furthermore, the defendants have failed to show that the alleged events giving rise to their motion caused them prejudice. We thus deny the motion without a hearing and determine that recusal is not warranted.[1]

## BACKGROUND

This motion for a new trial and for recusal of the trial judge was initially filed on behalf of defendant Anthony Salerno by Anthony Cardinale, Esq. We note that Mr.

Cardinale originally filed a Notice of Appearance but was absent during almost all of the trial. The motion is based on allegations that the court and a deputy marshal interfered with the deliberations of the jury and argues that as a result, both a hearing to examine the merits of the allegations and a new trial are necessary. Specifically the motion asserts that: (1) the court went to the jury room during deliberations and gave a coercive instruction without the knowledge or consent of the parties; (2) a deputy marshal forced the jury to hurry to a verdict by advising them that they would have to listen to 100 tapes; (3) the court told the forelady, during the deliberations on forfeiture, that the jury could not hang; and (4) the verdict was the result of compromise.[2]

In support of this motion, we are presented with post-verdict statements from three jurors. Cardinale's original argument in support of this motion states that a "private investigator" who was "independently retained by some of the defendants in this case" had collected the statements and turned them over to him. Cardinale Affidavit, ¶ 4. Cardinale maintains that neither he nor any other counsel was involved in conduct condemned by the Second Circuit. Indeed, as Cardinale notes, the Court of Appeals has said:

> [C]omplicity by counsel in a planned, systematic, broad-scale, posttrial inquisition of the jurors by a private investigator or investigators is reprehensible, to say the least.

*United States v. Brasco*, 516 F.2d 816, 819 n. 4 (2d Cir.1975), *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975).

However, Cardinale's affidavit neglects to note that he, all defense counsel, the defendants, and their agents were also barred from contacting jurors by direct order of this Court. The jury was not made completely anonymous despite concerns regarding the potential for jury tampering.

---

1. *See King v. United States,* 576 F.2d 432, 437 (2d Cir.1978) (recusal not required in determining whether to hold hearing on motion for same).

2. It may be that Cardinale's "Reply memorandum" withdraws this argument about a "compromise verdict" on behalf of Salerno but it will be considered since the other defendants joined the motion prior to the filing of the reply document.

Rather, the court sought to protect the jurors by sealing certain identifying information and by making it clear, in the presence of defense counsel and defendants, that there was to be absolutely no contact with the jurors by anyone involved with the trial without the court's permission. Trial Transcript (hereinafter "Tr.") at 50.

Cardinale's original submission on this motion failed to identify the private investigator who provided him with the jurors' statements. The government's answering letter surmised that Raymond P. Glynn, an investigator employed by Salerno throughout the trial, was responsible for collecting the jurors' statements and violating our direct orders. Cardinale's reply submission included a three-sentence affidavit of Raymond P. Glynn which states that he did in fact collect the statements. This Court has no independent recollection of whether Mr. Glynn was present in Court at the time the order was issued forbidding such activities.

The government would have this court conduct an investigation to determine the identity of all who violated the orders we made in the empaneling of the jury. We decline to do so. We are certainly concerned by the questions left unanswered by the Cardinale affidavit. However, we note that an investigation into the possible violations of 18 U.S.C. §§ 401, 402, and, perhaps, 1001 and 371 can be conducted after sentence by the United States Attorney and a grand jury.

## DISCUSSION

The first question presented by the Cardinale motion is whether it is necessary to have a hearing on the allegations of improper contact between the Court, the deputy marshal, and any one or more jurors. The teaching of the appellate courts is that such hearings are to be avoided whenever possible. *See, e.g., United States v. Moon*, 718 F.2d 1210 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

The doctrine which guides us in resolving this question is that jurors should be prevented from impeaching their own verdicts. This doctrine is well established and sup-

ported by several cogent rationales. For example, jurors are to be protected from being "harassed and beset by the defeated party in an effort to secure ... evidence of facts which might establish misconduct sufficient to set aside a verdict." *McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). To hold otherwise would be to make "what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *Id.* at 267–68, 35 S.Ct. at 784–85.

In addition, permitting jurors to freely attack their verdicts would undermine the finality of verdicts, threatening the viability of the jury in our legal system and forcing judges to act, in the words of Learned Hand, as "Penelopes, forever engaged in unravelling the webs they wove." *Jorgensen v. York Ice Mach. Corp.*, 160 F.2d 432, 435 (2d Cir.), *cert. denied*, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947). As the Second Circuit has stated, "jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain." *United States v. Dioguardi*, 492 F.2d 70, 79–80 (2d Cir.) (quoting *U.S. v. Crosby*, 294 F.2d 928, 950 (2d Cir.1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962)), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). Indeed, a central purpose of the rule is "the prevention of fraud by individual jurors who could remain silent during deliberations and later assert that they were influenced by improper considerations." *U.S. v. Eagle*, 539 F.2d 1166, 1170 (8th Cir.1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977).

The determination of the need for a hearing to investigate allegations that raise issues of jury-related irregularities lies within the discretion of the trial judge. A hearing may be required only when the allegations raise sufficient grounds to overcome the court's usual hesitation to ques-

tion a jury about its verdict. The Second Circuit has long held that sufficient grounds for a hearing are present only "when there is clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred which could have prejudiced the trial of a defendant." *Moon*, 718 F.2d at 1234 (citing *King v. U.S.*, 576 F.2d 432, 438 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978)).

■ The statements that form the basis for the instant motion do not meet the Second Circuit's requirements. Their failings can be grouped as follows:

1. The manner and form of presentation make the statements suspect;

2. The form of the statements is inconsistent with the assertions of defendants;

3. The discrepancies among the statements render them suspect; and

4. The internal inconsistencies of the statements render them of little probative value.

### 1. *The Manner and Form of Presentation.*

Defense counsel would have us believe that they knew nothing of the investigation until its results were brought to their attention. Cardinale Affid. ¶ 4. Cardinale asserts that only then, when he realized the significant impact that the three statements could have on his client's conviction, did he determine that it was his duty to bring these affidavits to our attention. In performing this duty, however, defense counsel originally was unwilling or unable to identify the investigator. We do not know whether this was done to shield Glynn from being held for contempt of court.

We have yet to be told how these supposedly unsolicited statements, which were taken in New York, arrived at Cardinale's office in Boston. Could it be that they were forwarded to him by New York counsel? Could it be that New York counsel did not feel the same sense of duty that moved Cardinale to file this motion? We

do not know because Cardinale has chosen not to tell us. We also do not know whether we have been provided with all of the information collected by the interviewer. Glynn's three sentence affidavit neither answers these concerns nor tells us of the manner in which the statements were obtained, or what consideration was given for them, if any.

Perhaps counsel's reluctance to vouch for the statements results in part from the fact that we have not been supplied with the original of any of the statements. The court is not unaware that it is possible to use a copy machine to insert part of one document into a copy of another, or that a signature can be melded into another document so that the reader cannot tell the difference. There are other indicia that the statements may have been altered or that they may be something other than claimed. These indicia are discussed under part three and four of this section.

It is also of grave concern to us that we are not told of the manner in which these statements were taken. In this context, we note that if we are to believe the top portion of the first statement, the statement was taken at mid-day at a busy intersection in the Bronx. We can well understand defense counsel's admitted reluctance to vouch for the statements. Cardinale Affid. ¶ 6.

### 2. *The Form of the Statements is Inconsistent with the Defendants' Assertions.*

Although the mystery and impropriety that accompany the presentation of the statements supporting this motion are alone sufficient to undermine their evidentiary value, we will next describe the attributes of the copies of the original statements themselves that render such statements inherently incredible.

We begin with defense counsel's assertion that each of the three statements were the result of the work of one private investigator, Ray Glynn. Cardinale Affid. ¶ 4–5. We are apparently asked to accept this assertion and the assertion that the investigator was neither hired nor guided by de-

fense counsel's knowledge of law at face value. Yet, the statements' appearance makes that difficult for us to do. For example, if one person took all three statements, it would be logical to expect that the three statements would at least follow the same form. They do not.

The following is a partial list of the differences in form among the statements:

(a) Statements # 1 and # 2 are each a typewritten "recounting of an interview with the jurors." Memorandum of Law in Support of Defendant's Motion for a New Trial and Recusal of Judge Lowe. ("Defense Memo.") p. 2 n. 2. Yet, statement # 3 is a handwritten statement in the first person and is notarized eight days after it was dated—surely enough time to have it typed.

(b) Statements # 1 and # 2 are sworn to as "true and accurate" representations, but not as "complete" representations. Statement # 3 has a certification at the beginning but no attestation at the end.

(c) The typewriter used for page 1 of statement # 1 appears to be different from that used for page 2 of that statement and both pages are typed differently than statement # 2. Page 1 of statement # 1 is single spaced. All other typed matter is double spaced.

(d) The introductory material on statement # 1 (date—time—place) is not provided in the same form as it is on statement # 2. For example, statement # 1 indicates that it was taken "Monday, June 13, 1988, Time 1205 hours." Statement # 2 does not provide the time but indicates only that it was taken "August 1, 1988." There is no introduction at all to statement # 3.

(e) The pages of handwritten statement # 3 are numbered, but statements # 1 and # 2 are unnumbered.

(f) The signatories' initials at the end of each page of statements # 1 and # 2 appear to be written in a style that is distinguishable from the style used in writing the initial letter of the fully signed name. For example, "Helen Talley" is signed at the end of statement # 2 with flourishes and curlicues but her initials elsewhere are stick letters printed without flourish.

This partial list of observable form differences is inconsistent with the representation that the statements were collected by one person and are sufficient, in and of themselves, to render the submitted statements suspect.

3. *The Discrepancies Among the Statements Render Them Untrustworthy.*

Counsel for the defendants makes much of the allegation in Statement # 1 that

[a]fter the first weekend, probably on Monday, the seventh day of deliberations, the door to the jury room was opened as they were taking a break for lunch or refreshments. The Judge, whose chambers' door was just opposite their door, appeared at their room and from the doorway told them they must work together and come to some decision. Either a conviction or acquittal, but she did not want a hung jury. All the jurors heard the Judge's remarks.

Statement # 1, first page.

We would expect that if such an incident had occurred, it would have been an extraordinary moment in the course of the deliberations and would have riveted the attention of the jurors. Yet, the second statement indicates that the juror "does not recall exactly what day this occurred, but it had to be on a lunch break on a day they did not go out to eat." Statement # 2, second page. The second statement was taken six weeks after the first and the investigator surely knew of the allegation and its significance. The third statement, taken even later than the second, contains no mention of the incident whatsoever. We recognize that jurors will have differing recollections of the deliberations, but such notable inconsistencies render these statements suspect. This is especially true because the allegations are present only on the unnumbered, unsigned pages of statements # 1 and # 2.

There are many other inconsistencies among the statements. Of particular note among these is the fact that the first, unsigned page of statement # 1 is the only source of corroboration for the allegations in statements # 2 and # 3. More specifically, statement # 2 does not corroborate the serious allegations contained in statement # 3 and statement # 3 does not even mention the substance of serious allegations contained in statement # 2.

### 4. The Internal Inconsistencies of the Statements Render Them of Little Probative Value.

Statement # 1 contains the most glaring internal inconsistencies of any one of the statements. The two unnumbered pages of the statement # 1 were apparently typed on different machines. The first page is single spaced and the second page is double spaced, the type size is different from one page to the next, and only on the second page does the type proceed across the page in an irregular manner rather than a straight line. No plausible explanation is given for these inconsistencies. The inconsistencies must also be viewed in light of the fact that (1) the preparer was apparently in no great hurry—the notary signed the second page of the statement on June 20, 1988, while the first page indicates that the statement was given on June 13, 1988; (2) the type used on the first page of statement # 1 does not seem to resemble that of statement # 2; and (3) we have been supplied only with copies of the statements rather than the originals and typewriter identification can be made only from originals.

In terms of substance, all of the serious charges contained in statement # 1 are on the unsigned first page. The information at the start of the second page does not flow logically from that at the end of the first. We note that once again there is no real explanation given for the inconsistency.

The only explanation for all of these inconsistencies is offered in the three sentence affidavit of Raymond P. Glynn:

Joyce Domingo typed the entire report of her interview herself making any additions and revisions before attesting to the truth and accuracy of the report.

This "explanation" is not credible. The defense apparently expects this Court to believe that an important investigative report was left by an experienced private investigator in the hands of the witness who could recant, leaving the investigator without even a contemporaneous note of his important conversation; that a witness would volunteer to type up a statement in the third person with quotes around the only line in the first person; and that a person typing a statement for her own signature would do so on two typewriters and compose it in a logically disjointed form. We find it is not reasonable to believe these rationales, particularly when they are tendered only after the government has raised the potential for fraud in the statement owing to its obvious inherent inconsistencies.

We wonder how anyone would expect the presentation of such evidence to be convincing. However, we recognize that on appeal, when these statements would in all likelihood be retyped in an appendix, the differences in type would disappear. We also recognize that the overwhelming evidence of the defendants' guilt leaves the defendants with little to appeal absent the allegations contained in this motion.

The problems described above are among many that we have with the statements underlying this motion and demonstrate how far the defense is from meeting the requirement of "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety occurred." *Moon*, 718 F.2d at 1234. We recognize that the counsel for the defense may argue that a hearing would provide them with the opportunity to produce that type of evidence. Nevertheless, the weight of authority indicates that such evidence is required at the outset to justify holding such a hearing.

It could not be otherwise. Our court system could not function if convicted criminal defendants could demand an investiga-

tion of the convicting jurors' minds on the basis of suspicious statements, such as these, which are solicited and in all likelihood written by a person whose identity was originally kept secret by the defense and who collected the statements under as yet undisclosed circumstances. The defense is aware of the level of proof that must be met to require a hearing or to overturn the jury's verdict. This application falls far short of that level.

While we feel that the above discussion presents sufficient reasons to deny this motion, we also believe that the motion must be denied because it fails to establish that there was any prejudice to the defendants. Even if we assume that the conduct alleged by the defendants' motion had occurred, there is no need for a hearing because the defendants have not been prejudiced by the alleged conduct.

To show the absence of prejudice we begin by viewing the alleged misconduct in the context of this long and exhausting trial, with a record now exceeding 28,000 pages. Next, we examine each of the allegations in turn and demonstrate why we consider the possibility of prejudice to be too remote to justify a hearing.

First, there is the assertion that during the jury deliberations on the various counts of the indictment the court spoke to the jury *ex parte* and told them that they must reach an accord because the court "did not want a hung jury." Statement # 1, first unnumbered page. This allegedly occurred at lunch time on the Monday after the first weekend after deliberations began. Statement # 1, first unnumbered page. Even if we assume that the court had made such a statement, precedent dictates that such action should only be considered prejudicial if there was an indication that the statement had *coerced* a verdict. *See, e.g., Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965). The circumstances in this case refute such an inference. The jury in this case remained without rendering a verdict from noontime on Monday, the time of the alleged misconduct, to noontime on Wednesday, when the verdict was rendered. The passage of 48

hours of deliberation demonstrates that the alleged statements by the court could not have had coercive effect on the verdict.

It has been held that the length of time between the court's alleged remarks and the actual rendering of the jury verdict may demonstrate whether the jury was coerced or unduly influenced by the remarks. *United States v. Burke*, 700 F.2d 70, 80–81 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). In *Burke*, following the jury's query whether it had to reach a verdict for all defendants, the judge responded that it was the desire of the court and all parties that the jury return a verdict on all defendants if the jury could do so without violating any juror's individual conscience. *Id.* at 78. The jury's request for instruction took place shortly after 12:00 noon on Saturday and the jury submitted additional requests and continued to deliberate until 6:25 p.m. When deliberations resumed on Monday, the jury submitted several additional requests for instruction and did not reach a verdict until 5:20 p.m. The Second Circuit held that the "substantial interval" between the request for instructions and the reaching of a final verdict "indicates that the jury freely exercised its decisionmaking authority and was not unduly influenced by the court's instruction." *Id.* at 80.

The distinguishing factor in cases involving a trial judge's *ex parte* instructions to the jury during its deliberations has been the extent of deliberation after the improper communication. *Krische v. Smith*, 662 F.2d 177, 179 (2d Cir.1981). Jury deliberations for shorter periods than those in the case at bar have been sufficient to refute claims of prejudice. For example, when a trial judge failed to notify counsel that he had instructed the jury to continue deliberating after the jury had indicated a deadlock, the Second Circuit affirmed the conviction in light of the jury's three full hours of deliberations after receiving the judge's mandate to continue. *U.S. v. Rodriguez*, 545 F.2d 829, 831 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). *See also U.S. v. Taylor*, 562 F.2d 1345, 1365–66 (2d Cir.1977) (conviction affirmed where deliberations continued for

almost two full days after the trial court's undisclosed communication with a juror), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).

Similarly, a conviction was upheld despite the trial judge's response to a jury note without first consulting counsel. The note stated that one juror could not work past 6:30 p.m. In reply, the judge asked: "Which juror, and is it absolutely impossible to work this evening? I said to you yesterday that we would work tonight, if necessary, and I feel that we must." *U.S. v. Blackmon,* 839 F.2d 900, 915 (2d Cir. 1988). The Second Circuit found that the "wording of the judge's response ... and the fact that the jury reached its verdict over two and a half hours before the 6:30 time limit suggested in its own note, convince us that the judge's response did not coerce the jury into returning a verdict." *Id.*

Cases finding error in a trial judge's instructions to the jury outside the presence of counsel are clearly distinguishable on their facts from the present situation. For example, in *Krische,* 662 F.2d 177, the jury deliberated for only an hour and twenty minutes after receiving the judge's instruction, in response to a jury note that indicated they were deadlocked, to continue deliberation. There were no requests made by the jury during that period. Likewise, in *U.S. v. Ronder,* 639 F.2d 931 (2d Cir. 1981), the verdict was returned one-half hour after the trial judge urged the jury to avoid a deadlock despite the jury's note "firmly reporting a deadlock." There the appellate court found error because the post-instruction deliberation time indicated that the trial judge's words "might have given the jury the impression that the Government's interest in a verdict was more meritorious than the purely personal concerns of the defendant." *Id.* at 932–33. *See also United States v. Glick,* 463 F.2d 491 (2d Cir.1972) (almost immediate verdict after supplemental instructions).

Here, unlike the situations in *Ronder* and *Krische,* the alleged remarks "cannot fairly be construed as coercing the jurors to resolve differences among themselves which they had expressly concluded to be irreversible." *Blackmon,* 839 F.2d at 915. This is not a case where a judge was directly responding to a jury note indicating an inability to reach agreement. Indeed, the record indicates that throughout deliberations the jury was proceeding steadily and methodically to a final decision. Moreover, there was a "substantial interval" of approximately 48 hours in which all coercive effects must have been dissipated. Additionally, nothing allegedly said by the Court could have conveyed the impression that the government had a stronger interest in a verdict than the defendants.

The fact which most tellingly puts to rest any contention that the verdict was coerced is that the jury actually returned a verdict stating that they could not agree as to certain of the predicate acts alleged against several defendants. If the jury had been instructed in the manner suggested by the motion, then it is clear that they ignored that instruction and no prejudice from it flowed to the defendants. *See Burke,* 700 F.2d at 80; *Krische,* 662 F.2d at 179; *Taylor,* 562 F.2d at 1366; *Rodriguez,* 545 F.2d at 831.

The second alleged improper communication with the jury is that at some time a deputy marshal told the forelady that if a decision was not reached quickly, then the jurors would have to "listen to over one hundred tapes." Statements # 3, fourth page, and # 1, first page.

The record shows that even if such a statement was made, it had no prejudicial effect on this jury. Throughout the deliberations the jurors sent in notes requesting specific tapes they wanted replayed. In fact, two afternoons before the verdict was reached the jury sent in a note reading:

5/2/88

Dear Judge Lowe,

The jury is inquiring your definition of "entirety", (a) Do we listen to all audio tapes concerning construction? (b) Or, all audio disputed tapes concerning Vincent DiNapoli?

Thank you,
Foreperson

Court's Exhibit # 34.

In response, the jury was told in open court:

THE COURT: The answer, is B. When I use the word 'entirety' I mean the specific disputed tape will be played in its entirety for you. I am informed there are about 5 of those tapes that are disputed. Alright? You may retire until we get the tapes set up.

Tr. at 24,404.

The jury listened to tapes from 4:09 p.m. to 4:45 p.m. that afternoon. Tr. at 24,404. They then took a recess into the jury room. Tr. 24,407. At 5:00 p.m. the jury sent another note to the Court:

5/2/88

Dear Judge Lowe,

The jury has decided not to listen to the remaining audio tapes concerning Vincent DiNapoli.

The jury also requests not to listen to the audio tapes concerning Edward Halloran.

Thank you,
Foreperson.

Court's Exhibit # 35.

On that same afternoon, with the consent of all counsel, the Court sent a marshal to the jury to inquire whether the jury wanted to hear a particular tape. The marshal reported:

I spoke to the juror, the forelady, and she replied that they did not want to hear that tape, that they are deliberating and did not need it.

Tr. at 24,408.

Thus, it is clear that, throughout their deliberations, the jury knew that it controlled the tapes they would listen to and, even if we assume that some deputy marshal had an improper conversation with the forelady, there has been no showing of prejudice. *See also* Tr. at 24,410 (requesting to hear additional testimony on day prior to verdict).

Absent a showing of prejudice, the motion, insofar as it is based on this allegation, must be denied. *See Government of Virgin Islands v. Gereau,* 523 F.2d 140, 153–55 (3d Cir.1975) (jury attendant's statement that the jury should hurry up so she could get home was not prejudicial, since it did not affect juror's vote and was not conveyed to the rest of the jury), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

The third allegation raised by the defendants raises the specter of jury impropriety during the forfeiture deliberations rather than the deliberations dealing with the guilt or innocence of the defendants. Again, the defense alleges an improper *ex parte* communication with the jury by the trial judge. Specifically, the statements submitted by the defendants assert that during a chance meeting between the judge and the forelady while the forelady was using the telephone in the judge's robing room, the judge directed that the forelady must pull the others together and reach a verdict. Again the trial judge allegedly stated that she did not want a hung jury. Statement # 1, first page. It is apparently asserted that this occurred late in the evening when, in response to a note from the judge offering refreshments, the forelady "sent back a reply that they would need pillows and blankets." Statement # 1, first page.

Once again, the circumstances of the deliberations belie the prejudice asserted by the defendants. The jury had already "hung" in connection with the acts or racketeering on the guilty/not guilty verdict. The jury apparently realized that the forfeiture proceeding was different and specifically asked:

Dear Judge Lowe,

The jury is inquiring if they can render hung jury decisions on 2 issues of special verdicts of forfeiture.

Court's Exhibit # 40; Tr. at 25,005.

That note was sent by the jury at 6:20 p.m., just before dinner. Tr. at 25,005. At that point the jury had already reached an unanimous verdict on all questions of forfeiture save two. The statements supplied by the defense motion do not specify which two items were then left open.

At 8:45 p.m. on the evening on which the forfeiture verdict was returned, in response to the note quoted above, the court gave a modified Allen charge to the jury without exception from the defense as to substance. Specifically, these instructions included:

Your verdict must reflect the conscientious judgment of each juror and under no circumstances should any juror yield his or her conscientious judgment.

. . . .

Your verdict at all times must represent your—when I say "your" that means each one of you—your considered judgment.

. . . .

Remember at all times, however, that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence or as to the applicability of the law to the evidence.

Tr. at 25,009–010.

Although the time that the alleged private instruction occurred is not clear from the defendants' motion papers, our conclusion is not affected. If it is argued that the private instruction to the foreperson occurred before this charge, the instructions in open court eliminated its effect on the rest of the jurors. Alternatively, if it is argued that the alleged private instruction occurred after this charge, then the fact that these admonitions were made to the entire jury in open court and that they preceded so closely in time the alleged improper statement makes it is difficult to imagine any of the eleven other jurors giving credence to the assertions of the foreperson. If they had, an immediate verdict would have surely resulted. Indeed, it is possible for a juror in that position to suspect that the foreperson herself had created this story to influence the entire verdict on forfeiture.

Finally, we note that it was not until midnight had passed that a forfeiture verdict was returned and that verdict was split between forfeiture and forgiveness. Tr. at

25,011. Thus, we again find that defendants have failed to show prejudice sufficient to warrant granting a hearing and we do not find that the jury was coerced.

Significantly, the Supreme Court has found that a combination of polling of the jury and supplemental instructions in a capital murder prosecution was not coercive in such a way as to deny the defendant any constitutional right. *Lowenfield v. Phelps,* —— U.S. ——, 108 S.Ct. 546, 98 L.Ed.2d 568 *reh'g denied,* —— U.S. ——, 108 S.Ct. 1126, 99 L.Ed.2d 286 (1988). In *Lowenfield,* a verdict imposing the death penalty was returned a mere 30 minutes after the completion of two polls of the jury and an *Allen* charge by the Court. The Supreme Court considered the polling, the supplemental charge, and the lack of objection by defense counsel and found that there was insufficient evidence to support a finding of coercion. The Court noted that it reached the conclusion of no coercion in the case despite the fact that "the qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Id.* 108 S.Ct. at 551 (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)).

The fourth and final issue raised by the statements, although defense counsel does not seem to explicitly raise this point, is that the verdict was the result of a compromise. This issue is raised by the allegations that the jury's decisions were reached by "swapping or trading off," that juror's "always had to give up something to get something," and that a "small number of jurists such as two or three people could dictate the decision of the majority." Respectively, statements # 1, second page; # 2, first page; # 3, p. 1.

It is undisputed that the testimony or statements of jurors that their verdict may have been the result of a compromise will neither be accepted by the court nor warrant the granting of a new trial. *Stein v. New York,* 346 U.S. 156, 178, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522 (1953); *United States v. Mulligan,* 573 F.2d 775 (2d Cir.), *cert. denied,* 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.

2d 120 (1978); *United States v. Green*, 523 F.2d 229 (2d Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *United States v. Grieco*, 261 F.2d 414 (2d Cir.1958), *cert. denied*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); *Jorgensen v. York Ice Mach. Corp.*, 160 F.2d 432, 435 (2d Cir.), *cert. denied*, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947). Indeed, the Supreme Court has specifically refused to accept a juror's disclosure of "compromise in a criminal case whereby some jurors exchanged their convictions on one issue in return for concession by other jurors on another issue." *Stein*, 346 U.S. at 178, 73 S.Ct. at 1089 (quoting *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)).

Courts have consistently refused to consider statements by jurors relating to the "mental processes through which they arrived at the verdict." *Green*, 523 F.2d at 235. The Second Circuit has specifically found that a new trial was not justified in cases where jurors' affidavits claimed that a compromise verdict had been reached because two jurors had vacation plans, *Id.* at 235–36, and where the jury agreed to abide by majority vote so that the jury foreman could return home. *Jorgensen*, 160 F.2d at 435.

Even in a situation where one juror so abused another that the first juror was shaken, crying, and upset the Second Circuit agreed that the circumstance did not constitute grounds for a new trial. *Grieco*, 261 F.2d at 415. There is nothing in the statements here that warrants upsetting the verdict in this case. It is clear from the overwhelming weight of authority that mere bargaining or internal pressures among jurors fails to justify such action. "It is not possible to determine mental processes of jurors by the strict tests available in an experiment in physics; we have to deal with human beings, whose opinions are inevitably to some extent subject to emotional controls that are beyond any accessible scrutiny." *Id.* at 415–16.

For all of the reasons stated above it is clear that no hearing is appropriate in the circumstances presented here and, there-fore, there is no need for recusal on the premises asserted in the motion. Recusal as demanded by the defendants is extraordinary and is not granted unless there is some realistic expectation of conflict or an objective appearance of impropriety. *Cf. United States v. Eyerman*, 660 F.Supp. 775 (S.D.N.Y.1987). The law could not be otherwise. If it were, a defendant, by means of any baseless motion coupled with a demand for recusal, could avoid being sentenced by the judge who has the greatest knowledge of the crimes for which the defendant is to be punished.

Judges, faced as we are here with post-trial motions and demands for recusal, have held a hearing as proposed by the present motion without recusing themselves. *See United States v. Glick*, 463 F.2d 491, 493 (2d Cir.1972) (where case on appeal and defendant moved for new trial alleging ex parte communication between judge and jury, Second Circuit remanded to trial judge to hold hearing); *see also United States v. Rivera*, 802 F.2d 593, 601 (2d Cir.1986); *King v. United States*, 576 F.2d 432, 437 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *Panico v. U.S.*, 412 F.2d 1151, 1155–56 (2d Cir.1969), *cert. denied*, 397 U.S. 921, 90 S.Ct. 901, 25 L.Ed.2d 102 (1970). However, we find such a hearing unnecessary.

In sum, we hold that defendants have not submitted sufficient evidence to support either a finding that the alleged improprieties occurred or that the alleged improprieties prejudiced the defendants. Accordingly, this motion filed on behalf of Salerno and deemed extended to all other defendants is denied in all respects.

It Is So Ordered.